[Cite as *Cox v. Metrohealth Med. Ctr. Bd. of Trustees*, 2012-Ohio-2383.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 96848

---

## JOSEPH COX, ET AL.

### PLAINTIFFS-APPELLANTS

vs.

## METROHEALTH MEDICAL CENTER BOARD OF TRUSTEES

### DEFENDANT-APPELLEE

---

## JUDGMENT:
## REVERSED AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-656202

**BEFORE:** Kilbane, J., Stewart, P.J., and Cooney, J.

**RELEASED AND JOURNALIZED:** May 31, 2012

**ATTORNEYS FOR APPELLANTS**

Paul W. Flowers
Paul W. Flowers Co., L.P.A.
Terminal Tower - 35th Floor
50 Public Square
Cleveland, Ohio 44113

Michael F. Becker
Becker Law Firm, L.P.A.
134 Middle Avenue
Elyria, Ohio 44035

**ATTORNEYS FOR APPELLEE**

James L. Malone
Marilena Disilvio
Clifford Masch
Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115

MARY EILEEN KILBANE, J.:

{¶1} Plaintiffs-appellants, Joseph Cox, a minor, and Mariann Cox, appeal the trial court's judgment, rendered after jury verdict, in favor of defendant-appellee, MetroHealth Medical Center Board of Trustees ("Metro"), on their medical malpractice claims. Finding merit to the appeal, we reverse and remand for a new trial.

{¶2} In April 2008, Joseph Cox ("Joseph"), and his mother, Mariann Cox ("Mariann") (collectively referred to as appellants), filed a medical malpractice complaint against Metro, alleging that Metro, through its agents and employees, was negligent in the care it provided to Joseph hours after his birth in 1988. Under R.C. 2305.16, if a person is a minor at the time the cause of action accrues, the applicable statute of limitations is tolled or suspended until such person reaches the age of majority. Here, Joseph was entitled to bring his medical malpractice claim within two years after his 18th birthday.

{¶3} In their amended complaint filed in April 2011, appellants alleged that Metro's negligence caused severe bruising to Joseph's back, shoulder, and head, as well as bleeding in his brain. They further alleged that as a direct and proximate result of the negligence, Joseph sustained severe and permanent injuries including significant cognitive and neurologic deficits. The matter proceeded to a jury trial in April 2011, at which the following evidence was presented.

{¶4} Joseph was born shortly after midnight on October 20, 1988, at Metro Hospital. At approximately 11:00 a.m., when Joseph was 11 hours old, Cheryl Switzer, R.N. ("Switzer") conducted a newborn assessment. She noted on Joseph's chart that his skin was normal, and his head and neck were normal. However, she also noted the existence of a cephalohematoma (temporary swelling) and bruising on the right side of Joseph's head. Switzer testified that the bruising and the cephalohematoma could be related to each other.

{¶5} After giving birth to Joseph, Mariann was moved to a regular hospital room. Joseph was brought to her room and placed in a bassinet beside her bed. Shortly thereafter, Mariann picked up Joseph to change his diaper and noticed that he was "blue." In a state of panic, Mariann handed Joseph to a woman whom she assumed was a Metro nurse. This woman, who was never identified, took him down the hall to the nursery. However, there was no nurse in the nursery at that time. About a minute later, another hospital employee emerged from the nursery and told Mariann that Joseph was fine. No one informed her that back blows had been administered.

{¶6} Barbara Dean, R.N. ("Dean") was the charge nurse for the nursery at Metro that afternoon. The nurse's aide who gave Joseph the back blows advised Dean that Joseph turned blue, and she delivered back blows for several seconds. Dean recorded this incident in Joseph's chart at 1:15 p.m. Dean acknowledged that applying too much force through back blows could possibly injure a baby. Dean testified that in 1988, nurse's aides were responsible for taking vital signs, feeding the baby if the mother was

unable to, and housekeeping duties.  The aides were not trained or authorized to give back blows and were expected to call for more experienced help whenever there was a problem.

{¶7} According to Joseph's chart, his skin looked "pink" and he was active shortly after the back blows were administered.  Approximately an hour later, Joseph began showing jitteriness and twitching.   On the morning of October 21, 1988, Joseph suffered a major seizure and was placed on a ventilator.   Joseph was then transferred to Metro's Neonatal Intensive Care Unit ("NICU").   A complete assessment of Joseph revealed that the whole back of his head was bruised and the back of his right shoulder was bruised.  In addition, his fontanel was now full and bulging.   Joseph was later diagnosed with a brain injury caused by an intraventricular hemorrhage.

{¶8} Patricia Fedorka, R.N., Ph.D., ("Fedorka"), professor of nursing at Chamberlain University and a labor and delivery nurse, testified that the back blows by the nurse's aide caused the bruising noted in the NICU at the time the assessment was completed.   She further testified that the standard of care was violated when the nurse's aide delivered the back blows and there was no nurse working in the nursery.   She testified that

> [the nurse's aide should have gotten] the nurse.   Like I said, if there is one
>
> baby in the nursery, an RN must be in that nursery.   That covers — that's a
>
> standard of care.   You cannot leave that nursery if you have even — if all
>
> the other babies are out with their moms and you have one baby in there,

you have an RN in there. For that very reason that, you know, you never know what's gonna happen. You cannot have an aide. It has to be an RN.

{¶9} Appellants also questioned various personnel at Metro about its failure to retain various employment records dating back to 1988. Nancy Palmer, R.N. ("Palmer"), testified as an official representative of Metro. Palmer testified that Metro was unable to identify the woman who delivered the back blows because Metro did not keep the assignment list with the aide's name on it.

{¶10} At trial, appellants argued that the administration of back blows caused the intraventricular hemorrhage. Metro, on the other hand, argued that the intraventricular hemorrhage was caused by a vein thrombosis (blood clot), which occurred during the blue spell and was unrelated to the back blows.

{¶11} Dr. Robert Lerer ("Dr. Lerer"), associate clinical professor of pediatrics at Children's Hospital in Cincinnati and University of Cincinnati College of Medicine, testified for the appellants. Dr. Lerer testified that Joseph sustained trauma from the slaps to his back, and this trauma eventually led to the hemorrhage in Joseph's brain. Dr. Lerer testified that imaging studies showed that subarachnoid and intraventricular hemorrhages had been ongoing. Dr. Lerer also testified that Joseph would have been neurologically normal if he had not received the back blows from the unidentified nurse's aide. Dr. Lerer further testified that he examined Joseph in June 2006. Joseph suffers

from cerebral palsy and has the mentality of a child under four years of age. His motor skills are significantly impaired, and he has little functional use of his left arm and hand.

{¶12} Appellants called Dr. Matt Likavec ("Dr. Likavec"), a neurosurgeon at Metro, to testify. Prior to trial, both appellants and Metro identified Dr. Likavec as an expert witness. However, before Dr. Likavec was scheduled to testify, Metro moved the court to restrict appellants' cross-examination of Dr. Likavec to matters regarding his treatment of Joseph and his role as a Metro employee. Metro argued that, because Dr. Likavec had been designated as a defense expert, it would be inappropriate for appellants to question Dr. Likavec in its case-in-chief. The trial court agreed with Metro, stating to appellants' attorney that "[y]ou will get to cross-examine him. So you can question [Dr. Likavec] about his role as [a hospital representative]. [Dr. Likavec] will come in in [defense counsel's] case and you can question him."

{¶13} At trial, Dr. Likavec testified that he treated Joseph in the NICU at Metro. Dr. Likavec testified that Joseph was diagnosed with a germinal matrix bleed. The radiologist who reviewed Joseph's CT scan also diagnosed him with a germinal matrix bleed and a subarachnoid hemorrhage. Appellants' counsel then asked Dr. Likavec the following question from his deposition in November 2009:

> Doctor, were you asked this question on line 2, page 46: If a newborn suffers some postpartum trauma, would they be more likely to suffer a germinal matrix bleed? What was your answer?
> Yes, sir.

{¶14} Appellants also called Dr. Orlando Carter Snead ("Dr. Snead"), head of neurology at the Hospital for Sick Children in Toronto. He testified that Joseph

sustained damage to his germinal matrix, which is an extremely fragile portion of a baby's brain. Dr. Snead testified that the back blows to Joseph's back caused an increase in his heart rate and blood pressure, which caused bleeding in his brain. He further testified that Joseph suffered a germinal matrix hemorrhage, which ruptured and expanded into his brain. Dr. Snead opined that Joseph would have been neurologically normal if he had not received the back blows from the unidentified nurse's aide.

{¶15} At the close of appellants' case, Metro withdrew Dr. Likavec as an expert witness. As a result, appellants were denied the opportunity to present Likavec's deposition testimony that the severe back blows to Joseph could have caused the bleed.

{¶16} In its defense, Metro called Dr. Richard Martin ("Dr. Martin"), head of neonatalogy at Rainbow Babies and Children's Hospital; Dr. Max Wiznitzer ("Dr. Wiznitzer"), a pediatric neurologist; Dr. Robert Zimmerman ("Dr. Zimmerman"), a pediatric neuroradiologist from Children's Hospital in Philadelphia; and Dr. Joseph Volpe ("Dr. Volpe"), a professor of pediatric medicine at Harvard Medical School.

{¶17} Metro's witnesses agreed, when a baby turns blue and stops breathing, back blows may be administered to get the child breathing again. The doctors agreed that Joseph's blue spell was an initial manifestation of a seizure disorder and that the intraventricular hemorrhage was caused by a blood clot in his brain. Both Dr. Zimmerman and Dr. Volpe testified that they observed clots in the medullar veins in Joseph's CT and ultrasound scans. Dr. Martin and Dr. Wiznitzer explained that the clot caused the blood to back up and rupture into the ventricle and that the clot precipitated the

chain of events that led to Joseph's brain injury. Dr. Wiznitzer further testified the back blows did not cause Joseph's brain hemorrhage.

{¶18} At the conclusion of the trial, the jury rendered a verdict through the issuance of three separate jury interrogatories and a general verdict form. In the first interrogatory, the jury found that Metro deviated from the standard of care and treatment of Joseph. In the second interrogatory, the jurors identified the specific acts or omissions constituting the deviation from the standard of care as follows:

> Standard of care was not met because it is a reasonable expectation to have a nurse or physician available while in the care of a hospital. Lack of record keeping or training, employee records, and employee responsibilities were not properly or accurately retained.

{¶19} In responding to the third interrogatory, six of the eight jurors answered "no" to the following: "if you found by a preponderance of the evidence that Metro deviated from the standard of care, do you find by a preponderance of the evidence that any such deviation proximately caused injury to Joseph Cox." The same six jurors signed the general verdict form in favor of Metro.

{¶20} Appellants now appeal, raising the following six assignments of error for review, which shall be discussed together where appropriate.

### ASSIGNMENT OF ERROR ONE

> [Appellants'] medical malpractice claim was irreparably impaired when the trial judge refused to allow proximate cause opinions to be elicited from a treating neurosurgeon, Matt Likavec, M.D., during their case-in-chief.

## ASSIGNMENT OF ERROR TWO

The trial judge abused his discretion, to the [appellants'] substantial detriment, by rejecting their timely request to present selected portions of Dr. Likavec's deposition to the jurors in rebuttal.

## ASSIGNMENT OF ERROR THREE

[Appellants'] counsel was subjected to unfair surprise and precluded from conducting a proper cross-examination, when a defense expert, Richard Martin, M.D., was allowed to change his opinions without prior notice during the jury trial.

## ASSIGNMENT OF ERROR FOUR

By refusing to require [Metro] to adhere to the prior written pledge that defense expert [Dr. Volpe] would be presented strictly for purposes of rebutting one of [appellants'] experts, the trial judge committed an unmistakable abuse of discretion.

## ASSIGNMENT OF ERROR FIVE

The trial judge further abused his discretion when he allowed Dr. Volpe to relay his findings and opinions to the jurors that were based upon the hearsay reports of other experts and were not sufficiently reliable.

## ASSIGNMENT OF ERROR SIX

The jurors were [misled], to [appellants'] considerable detriment, by legally erroneous and inapplicable jury charges.

### Cross-Examination and Rebuttal Testimony of Dr. Likavec

{¶21} In their first assignment of error, appellants argue that their medical malpractice claim was irreparably impaired when the trial court refused to allow Joseph's treating physician, Dr. Likavec, to testify as to the proximate cause of Joseph's injuries. In their second assignment of error, appellants argue that the trial court abused its discretion by excluding the admission of Dr. Likavec's deposition testimony, which they

offered to rebut Dr. Wiznitzer's opinion that the back blows did not cause Joseph's brain hemorrhage.

**{¶22}** A trial court has broad discretion in the admission or exclusion of evidence. *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (1991). An appellate court will not reverse an evidentiary ruling absent an abuse of discretion and a showing of material prejudice. *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985); *Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, 905 N.E.2d 1246, ¶ 31 (8th Dist.). An abuse of discretion "'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶23}** In *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, the Ohio Supreme recognized that decisions regarding the admissibility of evidence "will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." *Id.* at ¶ 20, citing *O'Brien v. Angley*, 63 Ohio St.2d 159, 407 N.E.2d 490 (1980). Moreover, this court, relying on *O'Brien*, recently held that error in the admission or exclusion of evidence is not grounds for reversal unless the error prejudiced substantial rights of the complaining party. *Mason v. Pawloski*, 8th Dist. No. 95766, 2011-Ohio-3699, ¶ 20, citing Civ.R. 61. In order to determine whether a substantial right has been affected, "the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those

errors had not occurred, the jury * * * would probably have made the same decision." *O'Brien* at 165.

{¶24} In the instant case, both parties identified Dr. Likavec as an expert witness prior to trial. Before Dr. Likavec was scheduled to testify, Metro moved the court to restrict appellants' cross-examination of Dr. Likavec to matters regarding his treatment of Joseph and his role as a Metro employee. Metro argued that because Dr. Likavec had been designated as a defense expert, it would be inappropriate for appellants to question Dr. Likavec in its case-in-chief.

{¶25} The trial court agreed with Metro, stating to appellants' attorney that

[defense counsel] has a right to present his own case. You will get to cross-examine him. So you can question [Dr. Likavec] about his role as [a hospital representative]. [Dr. Likavec] will come in in [defense counsel's] case and you can question him.

The trial court further stated: "Dr. Likavec is from Metro so he's on cross. And my understanding is that he's going to be in their case, and then if the defense wants to call him, Dr. Likavec, back, they can do that." Through clever trial strategy, Metro withdrew Dr. Likavec as an expert witness and appellants were denied the opportunity to present Dr. Likavec's testimony that back blows could have caused the germinal matrix bleed.

{¶26} Appellants contend that the trial court's ruling allowed Metro to conceal critical opinion testimony from Joseph's treating neurosurgeon. They contend Dr. Likavec's testimony was more credible than their other expert's testimony because he treated Joseph in the NICU and continued to treat Joseph for the next eight years.

{¶27} Here, the trial court was well aware before trial that Dr. Likavec was listed

as an expert on appellants' and Metro's expert witness lists.   However, the trial court denied appellants the opportunity to present Dr. Likavec's expert opinions during their case-in-chief, stating that Dr. Likavec "will come in in [defense counsel's] case and you can question him [then]."   In reaching its decision, the trial court proceeded under the notion that appellants would have the opportunity to question Dr. Likavec further during Metro's case-in-chief.

{¶28} Based on these circumstances alone, the trial court's decision to limit Dr. Likavec's testimony was not an abuse of discretion.   However, this decision, coupled with the trial court's decision to deny appellants the opportunity present Dr. Livakec's deposition testimony to rebut Dr. Wiznitzer's testimony, resulted in an abuse of discretion by the trial court.

{¶29} In the instant case, Metro presented testimony from Dr. Wiznitzer, who testified that there was no bleeding in the germinal matrix and the back blows did not cause the intraventricular hemorrhage in Joseph's brain.   Appellants' counsel asked Dr. Wiznitzer on cross-examination the following questions:

> [Appellants' Counsel]:   I want you to assume [it] is true that Dr. Matt Likavec was [Joseph's] neurosurgeon and he has given testimony under oath, that he will opine or has opined, that in this case with [Joseph], if there is a medullary vein thrombosis, it's secondary to his germinal matrix bleed.   Do you agree or disagree?
>
> * * *
>
> [Dr. Wiznitzer]:   I disagree.
> * * *
>
> [Appellants' Counsel]:   I want you to assume [it] is true that the back

blows were sufficient enough to cause the bruising on [the back of Joseph's head, back and shoulder], * * * Dr. Matt Likavec, this child's own pediatric neurosurgeon, will say if that is true[,] * * * it's more likely than not * * * that that's what caused [Joseph's] brain bleed.

* * *

[Dr. Wiznitzer]:   If this was hypothetically said, he's incorrect.

{¶30} Appellants requested that Dr. Likavec be called as a rebuttal witness to Dr. Wiznitzer's testimony.   The trial court denied appellants' request.   The court stated that "I'm not going to allow [Dr. Likavec] to be called in rebuttal.   And the reason I'm not is that I felt because — we all said he was coming back."   However, appellants were denied the opportunity to question Dr. Likavec because Metro withdrew Dr. Likavec as an expert.

{¶31} The trial court did express a willingness, though, to consider playing to the jury portions of Dr. Likavec's deposition testimony.   After reviewing the video deposition, the trial court refused to permit the video as rebuttal testimony, explaining that:

As much as I would prefer to just play the seven-minute clip because you've been here long enough, as far as I'm concerned, it's the decision between bringing Dr. Likavec back and letting everybody work it out for a day.   And it's not the time.   It's not the time to make a decision.   I'm going to make a decision and I'm going to — I believe I've decided the issue already.   And I'm not going to allow the clip.

And for the record, I understand why you want it, but he was an expert and he has been withdrawn.   So if that proves me wrong, then I will stick with my decision.   So I am not going to play it.   * * *.

{¶32} We recognize that a party has an unconditional right to present rebuttal testimony on matters that are raised for the first time in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief. *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410, 1994-Ohio-389, 644 N.E.2d 286, citing *Katz v. Enzer*, 29 Ohio App.3d 118, 504 N.E.2d 427 (1st Dist.1985). In *Nickey v. Brown*, 74 Ohio App.3d 32, 35, 454 N.E.2d 177 (9th Dist.1982), the Ninth District Court of Appeals explained that rebuttal evidence "is that which is given to explain, repel, counteract, or disprove facts given in evidence by the adverse party. It is that evidence which has become relevant or important only as an effect of some evidence introduced by the other side. * * *" *Id.*, quoting 31 Corpus Juris Secundum, Evidence, Section 2, at 818.

{¶33} In the instant case, it is difficult to imagine a more necessary rebuttal than one that offers expert opinion testimony from one of appellants' own experts and Metro's own treating neurosurgeon, which contradicts Metro's position of proximate cause. During Metro's case-in-chief, its witness, Dr. Wiznitzer, testified that Dr. Likavec would be incorrect if he opines that the back blows caused Joseph's brain injury. Dr. Likavec treated Joseph in the NICU once the subarachnoid and intraventricular bleeds had been identified, and he continued to treat Joseph for the next eight years. Dr. Likavec testified at his deposition that Joseph sustained a germinal matrix bleed and that back blows could have caused the bleed. Specifically, he summarized his opinion as to the proximate cause of the brain damage as follows:

> Q. I want you to assume for me that the back blows that were delivered by the [nurse's aide] caused a large bruise on the back of [Jospeh's] head, his back and his shoulder, it was described as covering the — almost the entire area by the nurse that recorded the NICU assessment, and the question that I have is, under that assumption, is it more likely than not that that was the cause of [Joseph's] germinal matrix bleed?
>
> A. Assuming severe back blows and severe bleeding, that more likely than not that could be the cause of it.

{¶34} Appellants attempted to offer this testimony to rebut Metro's position that Joseph's injuries were not proximately caused by the back blows, which was first alleged in Metro's case-in-chief. Because of his considerable experience with Joseph's condition and his role as an employee of Metro, Dr. Likavec was in the best position to testify how the back blows could have caused the germinal matrix bleed and would have been the only expert physician to offer first-hand information about Joseph at the time of the injury. Appellants had a right to present their testimony to rebut Dr. Wiznitzer's testimony that the back blows could not have caused Joseph's brain injury. The jury, however, was denied the opportunity to hear the rebuttal testimony.

{¶35} Moreover, the trial court's reason for denying appellants' request was that Dr. Likavec was "an expert and he has been withdrawn. So if that proves me wrong, then I will stick with my decision." Dr. Likavec, however, was also listed as appellants' expert, yet the trial court did not allow appellants the opportunity to present him as such. Then, the trial court allowed Metro to discredit Dr. Likavec's testimony, without allowing appellants the opportunity to rebut Dr. Wiznitzer's testimony. Fundamental principles of fairness dictate that each party be given the opportunity to present their case on the merits. *See Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987) (where the Ohio Supreme Court held that "[t]he right of defendant to present his own witnesses to establish a defense is a 'fundamental element of due process of law.' * * * The overall purpose is to produce a fair trial.") *See also State v. Kaplan*, 8th Dist. No. 91388, 2010-Ohio-508. By excluding this testimony, the appellants were prevented from calling their expert witness and fully presenting their case. For these reasons, we find that the exclusion of Dr. Likavec's deposition testimony was prejudicial to appellants, and therefore, was an abuse of discretion.

{¶36} Accordingly, the first assignment of error is overruled and the second assignment of error is sustained. The matter is remanded for a new trial.

Unfair Surprise

**{¶37}** In the third assignment of error, appellants argue they were subjected to unfair surprise and precluded from conducting a proper cross-examination, when a defense expert, Dr. Martin, was allowed to change his opinions during trial without prior notice.

**{¶38}** At his deposition, Dr. Martin testified that he believed Joseph was born with coagulopathy (an impairment of the blood's ability to clot) and that this condition was one of the "likely possibilities" that caused the hemorrhage. At trial, when defense counsel questioned Dr. Martin about the events that precipitated the onset of brain damage, appellants objected and the court held a sidebar conference. Appellants' counsel advised the court that Dr. Martin had conceded during his deposition that he did not hold any opinions with regard to the etiology of the brain bleed to a probability. Defense counsel responded that his expert "has learned more things since then" and could be cross-examined about his new opinions as to when the brain bleed occurred. The court permitted the testimony and noted appellants' continuing objection. Dr. Martin then explained to the jury how he originally suspected coagulopathy as a possible diagnosis, but investigated the matter further following his deposition and reached a new opinion. He testified that back blows could not have caused the brain bleed. During cross-examination, Dr. Martin acknowledged that he had not notified appellants' counsel of the revision of his opinion. Appellants argue that this evidence unfairly prejudiced their case.

**{¶39}** Civ.R. 26(E)(1)(b) requires a party to seasonably supplement responses to any questions directly addressed to the subject matter on which an expert is expected to testify. "This duty * * * is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 370, 504 N.E.2d 44 (1986), abrogated on other grounds in *State v. D'Ambrosio*, 67 Ohio St.3d 185, 1993-Ohio-170, 616 N.E.2d 909. The purpose of Civ.R. 26(E)(1)(b) is to prevent "trial by ambush." *Id.* at 371.

**{¶40}** Loc.R. 21.1, which governs the use of expert witnesses and expert reports in Cuyahoga County, further provides, in pertinent part:

A party may not call an expert witness to testify unless a written report has been procured from the witness and provided to opposing counsel. It is counsel's responsibility to take reasonable measures, including the procurement of supplemental reports, to insure that each report adequately sets forth the expert's opinion. However, unless good cause is shown, all supplemental reports must be supplied no later than thirty (30) days prior to trial. The report of an expert must reflect his opinions as to each issue on which the expert will testify. An expert will not be permitted to testify or provide opinions on issues not raised in his report.

{¶41} The trial court has discretion to determine whether there has been a violation of Loc.R. 21.1 and how to remedy that violation. *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 257-258, 1996-Ohio-159, 662 N.E.2d 1; *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph one of the syllabus. Thus, a reviewing court should not disturb a trial court's decision regarding a discovery sanction absent an abuse of discretion. *Nakoff* at syllabus; *see also Vaught v. Cleveland Clinic Found.*, 98 Ohio St.3d 485, 2003-Ohio-2181, 787 N.E.2d 631, ¶ 13.

{¶42} In *O'Connor v. Cleveland Clinic Found.*, 161 Ohio App.3d 43, 2005-Ohio-2328, 829 N.E.2d 350, ¶ 25 (8th Dist.), this court found that a party's failure to disclose a critical new theory by an expert witness is a violation of Civ.R. 26(E) and Loc.R. 21.1. In *O'Connor*, we recognized the necessity of supplementing expert testimony, stating that "the introduction of a new theory that has not been disclosed prior to trial 'smacks of ambush' and thwarts an opposing counsel's ability to effectively offer a counter theory or to cross-examine the expert." *Id.* at ¶ 20, citing *Jackson v. Booth Mem. Hosp.*, 47 Ohio App.3d 176, 178, 547 N.E.2d 1203 (8th Dist.1988). We concluded that the trial court abused its discretion by allowing an expert witness to offer a new opinion on the possible cause of the injury, holding that "[t]he failure to disclose the new theory in either an expert report, as a supplement to [the doctor's] deposition, or by supplementing responses to original interrogatories distorted the level playing field." *Id.* at ¶ 23.

{¶43} Similarly, in the instant case, appellants had a reasonable expectation, in the

absence of a supplement to Dr. Martin's deposition testimony, that his trial testimony would be consistent with the original responses provided in the discovery process. Metro argues that Dr. Martin's opinion at trial was not a new or undiscussed theory as to the cause of Joseph's brain bleed. Because this dispute goes to the heart of the claim, we find that appellants were surprised and prejudiced by Dr. Martin's new theory that the back blows could not have caused the brain bleed.

{¶44} The dissent relies on *Wright v. Suzuki Motors Corp.*, 4th Dist. Nos. 03CA2, 03CA3 and 03CA4, 2005-Ohio-3494, to support the argument that the trial court did not abuse its discretion when it allowed Dr. Martin to testify at trial because the substance of Dr. Martin's deposition testimony did not change. Respectfully, our reading of this case reveals differences that makes *Wright* distinguishable from the instant case.

{¶45} In *Wright,* the plaintiff's expert was unable to opine, prior to trial, within a reasonable degree of scientific certainty, the proximate cause of a motorcycle accident. At trial, plaintiff's counsel asked plaintiff's expert a hypothetical question as to the proximate cause of the accident. Defense counsel objected and argued that before trial, plaintiff's expert testified in his deposition that he could not form an opinion within a reasonable degree of scientific certainty as to the proximate cause of the motorcycle accident. The trial court then questioned plaintiff's expert as to why his opinion now differed. Plaintiff's expert explained that now he was allowed to assume that the motorcycle had a wobble in the front wheel; whereas, at the deposition, he was never asked to assume that fact to be true.

**{¶46}** The Fourth District Court of Appeals found that the trial court did not abuse its discretion when it allowed plaintiff's expert to testify because the plaintiff's expert opinion that

> the defective wheel was a proximate cause of the accident remained the same throughout the litigation. What changed, * * * was his ability to include additional information for his consideration and to express his opinion within a reasonable degree of scientific certainty. Thus, like [*Faulk v. Internatl. Business Machines*, 1st Dist. Nos. C-765 and C-778, 2001 WL 1020749 (Sept. 7, 2001)], this is not a case in which the expert was unable to give an opinion regarding causation during a deposition but did so at trial. It also is not a case in which the expert specifically changed his opinion or in which the substance of his testimony was revealed for the first time at trial and the opposing party had no reason to anticipate it.

*Wright* at ¶ 87.

**{¶47}** Unlike *Wright* where plaintiff's expert modified his opinion in response to a hypothetical question, in the instant case, Dr. Martin changed the substance of his opinion based on information he obtained after his deposition. Dr. Martin initially could not identify the origin of the brain bleed with any certainty. At his deposition, he testified that coagulopathy was just one of the likely possibilities. At trial, defense counsel explained to the trial court that Dr. Martin "has learned more since [his deposition.]" He proceeded to testify that he originally suspected coagulopathy as a possible diagnosis, but investigated the matter further after his deposition and reached a new opinion.

**{¶48}** This is the type of unfair surprise or trial by ambush envisioned under Civ.R. 26(E) and Loc.R. 21.1. Therefore, the third assignment of error is sustained.

### Dr. Volpe's Testimony

**{¶49}** In the fourth assignment of error, appellants argue that the trial court abused

its discretion when it allowed the videotaped trial deposition of Dr. Volpe to be played for the jury. They contend most of Dr. Volpe's testimony was inadmissible because he provided expert opinions relating to proximate cause, but never provided appellants with an expert report prior to trial.

{¶50} As previously discussed, a party has an obligation to provide the opposing party with expert reports before trial to avoid a trial by ambush. *Shumaker*, 28 Ohio St.3d at 370, 504 N.E.2d 44; Civ.R. 26(E)(1)(b); Loc.R. 21.1. However, the court has discretion in determining the appropriate remedy, if any, for a discovery violation. Thus, trial courts exclude evidence only when clearly necessary to enforce willful noncompliance or to prevent unfair surprise. *Nickey*, 74 Ohio App.3d at 34, 454 N.E.2d 177.

{¶51} Initially, Metro identified Dr. Volpe as a rebuttal witness to be called for the sole purpose of rebutting one of appellants' expert's interpretation of one of Dr. Volpe's treatises. Although it is undisputed that Metro never provided appellants with an expert report from Dr. Volpe, the absence of a report is of no consequence because appellants took Dr. Volpe's discovery deposition before trial and questioned him extensively on a number of issues beyond his treatise, including the crucial issue of whether back blows could have caused Joseph's hemorrhage.[1]

{¶52} Appellants' counsel questioned Dr. Volpe about the pathology related to

---

[1] The parties stipulated at Dr. Volpe's deposition that he was an expert, licensed to practice medicine in Massachusetts.

Joseph's brain injury and his belief that it was likely caused by venous thrombosis. Dr. Volpe testified that trauma is a "really uncommon" cause of both intraventricular hemorrhage and venous thrombosis. He also opined that he did not think that back blows could cause sufficient increase in blood pressure or increase in cerebral blood flow to lead to a major intraventricular hemorrhage. He testified that even if pain could cause an increase in cerebral blood flow, he did not think it could cause a major ventricular hemorrhage. In addition, appellants' counsel asked Dr. Volpe:

Q: You reference an apneic episode predated the blows. Was that from someone's deposition? I know Dr. Martin made that statement.

A: No, I've seen babies, term babies with intraventricular hemorrhage, and I've seen infants who — in whom the first of the clinical event was apneic and cyanosis, so I just raised that as a possibility.

{¶53} Later, appellants' counsel asked Dr. Volpe:

Q: Now, would you agree, Doctor, that if there were back blows on a full-term newborn sufficient enough to cause bruising on the back and on the back of the child's head, hypothetically, that would be considered a noxious stimulation to a newborn?

A: I'm not sure of that. I mean, I know that — I've certainly seen a lot of babies, term babies get back blows. Now, I don't remember seeing babies get bruising.

Q: Right. And I should ask on the record, your [sic] not giving an opinion on the standard of care in this case, true?

A: No, I'm not.

[Metro's Counsel]: Well, you just asked him, I thought. If you want to waive that, you certainly opened the door to it, but we're more than happy to hear it.

Q: I'm sorry, Doctor.

A: I got lost a little bit on the question.

Q: What was the balance of his answer?
(Witness's previous answer read back.)

A: And I hadn't seen babies develop any hemorrhage from that.

Q: Right. You have never seen a baby have back blows sufficient enough to cause bruising on the back of the head and the back of the shoulder, have you? * * *

A: I don't remember seeing that, no.

* * *

Q: You're not suggesting that back blows sufficient enough to cause bruising is appropriate, correct?

A: I've not seen back blows cause bruising —

Q: Right.

A: — so I don't know.

Q: You're not suggesting that back blows that cause bruising, hypothetically, are appropriate?

[Metro's Counsel]: You want him to be a standard of care expert?

[Appellants' Counsel]: No.

[Metro's Counsel]: Well, you do with that question.

[Appellants' Counsel]: I don't remember what his question was earlier.

[Metro's Counsel]: But, I mean, when you ask him about the propriety of back blows and bruises, that is standard of care, and if you want to go there, I'm more than happy to take him there. You can withdraw the question or you can present it. I'm just giving you fair warning.

{¶54} Appellants' counsel did not withdraw the question. Counsel ended the

deposition after questioning Dr. Volpe extensively on pivotal issues in this case, including matters related to proximate cause. As previously explained, the Civil Rules and Loc.R. 21.1 require the exchange of an expert's report prior to trial to prevent unfair surprise and to allow the opposing part to adequately prepare for cross-examination of that witness. Having questioned Dr. Volpe on all his opinions related to the appropriateness of back blows and whether back blows could have caused Joseph's injury, appellants' counsel knew his opinions, and therefore, had the opportunity to prepare for cross-examination before his trial deposition commenced. Based on these circumstances, we do not find any unfair surprise.

**{¶55}** Therefore, the fourth assignment of error is overruled.

<u>Dr. Volpe's Causation Opinions</u>

**{¶56}** In their fifth assignment of error, appellants argue that the trial court abused its discretion when it allowed Dr. Volpe to offer his opinions on causation because his opinions were based on hearsay. They contend that because his opinions were based on other expert reports, they were not sufficiently reliable.

**{¶57}** Foundational requirements for admission of an expert's opinion testimony are set forth in Evid.R. 703 and 705. Evid.R. 703 provides: "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." Evid.R. 705 provides: "[t]he expert may testify in terms of opinion or inference and give the expert's reasons therefore after disclosure of the underlying facts or data. The disclosure may be in

response to a hypothetical question or otherwise." The Ohio Supreme Court has held that: "[w]here an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." *State v. Solomon*, 59 Ohio St.3d 124, 570 N.E.2d 1118 (1991), syllabus.

{¶58} In the instant case, Dr. Volpe testified at trial that he had reviewed Joseph's CT and ultrasound scans as well as a portion, though not all, of his chart. He also reviewed the depositions of Dr. Lerer, Dr. Snead, Dr. Zimmerman, Dr. Barnes, and a nurse expert. Based on his review of these items, his own literature, and personal experience, Dr. Volpe testified that there was no connection between Joseph's injury and the administration of back blows. Although he reviewed other doctors' opinions, his conclusion was primarily based on the fact that, in his review of the diagnostic studies, he observed a hemorrhagic infarction in the cerebral white matter, in association with medullary vein thrombosis. In particular, Dr. Volpe testified that Joseph's CT scan was "indicative of thrombosis."

{¶59} We find that Dr. Volpe's expert opinion was admissible because it was primarily based on his own review of the diagnostic tests. As such, the trial court did not abuse its discretion by allowing Dr. Volpe's opinions into evidence.

{¶60} Accordingly, the fifth assignment of error is overruled.

Jury Instructions

**{¶61}** In the sixth and final assignment of error, appellants argue that the court gave the jury erroneous and inapplicable instructions. They contend these erroneous jury instructions misled the jury and warrant a new trial.

**{¶62}** We note that the giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal unless the record demonstrates an abuse of discretion. *Prejean v. Euclid Bd. of Edn.*, 119 Ohio App.3d 793, 804-805, 696 N.E.2d 606 (8th Dist.1997), citing *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989). "An inadequate jury instruction that misleads the jury constitutes reversible error." (Citations omitted.) *Groob v. KeyBank*, 108 Ohio St.3d 348, 355, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 32.

**{¶63}** The appellants first challenge the trial court's jury instruction on the foreseeability of the injury as it relates to the standard of care Metro owed to Joseph. Under Ohio law, in order to present a prima facie claim of medical malpractice, a plaintiff must establish: (1) the standard of care, as generally shown through expert testimony; (2) the failure of defendant to meet the requisite standard of care; and (3) a direct causal connection between the medically negligent act and the injury sustained. *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), syllabus. The existence of a duty, or standard of care, depends on the foreseeability of the injury. *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). In order to determine what is foreseeable, a court must determine "whether a reasonably prudent person would have

anticipated that an injury was *likely* to result from the performance or nonperformance of an act." (Emphasis added.) *Id.* at 77.

**{¶64}** Here, the trial court instructed the jury on this rule of law using similar language that resembles the suggested charge set forth in the Ohio Jury Instructions. The court charged the jury as follows:

> So, in determining whether ordinary care was used, you must consider whether [Metro's] nursing assistant should have foreseen, under the attending circumstances, that the natural and probable result of an act or omission on her part would cause some injury to the plaintiff.
> The tests for foreseeability is not whether the nursing assistant should have foreseen the injury in its precise form, but whether in light of all the circumstances, the reasonable prudent person would have anticipated that an injury was likely to result to someone from their acts or omissions.

**{¶65}** In comparison, the foreseeability instruction from Ohio Jury Instructions, Section 401.07, provides that:

> In deciding whether (reasonable) (ordinary) care was used, you will consider whether the (defendant) (either party) in question should have foreseen under the circumstances that the likely result of an act or failure to act would cause some (injury) (damage).
>
> The test for foreseeability is not whether a person should have foreseen the (injury) (damage) exactly as it happened to the specific (person) (property). The test is whether under all the circumstances a reasonably careful person would have anticipated that an act or failure to act would likely (result in) (cause) some (injury) (damage).

**{¶66}** Appellants argue that the use of the word "likely" in the foreseeability charge creates a heightened and unfair burden for them to establish the duty element of their medical malpractice claim. However, we have previously rejected this same argument in *Ratliff v. Mikol*, 8th Dist. No. 94930, 2011-Ohio-2147, ¶ 10. In *Ratliff*, the

trial court used the word "likely" in its foreseeability jury instruction. We found that the instruction was proper because it mimicked the language given by the Ohio Supreme Court in *Menifee,* 15 Ohio St.3d at 77, 472 N.E.2d 707. As previously stated, the *Menifee* court defined foreseeability in terms of "whether a reasonably prudent person would have anticipated that an injury [is] *likely* to result from the performance or nonperformance of an act." (Emphasis added.) *Id.* at 77. Therefore, the court's use of the word "likely" in its definition of foreseeability was not an abuse of discretion.

{¶67} Appellants next argue that the court's definition of proximate cause was misleading. The court's charge on "proximate cause" reads as follows:

Proximate cause is an act or failure to act which in the natural and continuous sequence directly produces the injury and without which it could not have occurred. Cause occurs when the injury is the natural and foreseeable result of the act or failure to act.

But, a person is not responsible for injury to another if the negligence is a remote cause and not a proximate cause.

A cause is remote when the result could not have been reasonably foreseen or anticipated as being a likely cause of any injury.

{¶68} The proximate cause instruction from Ohio Jury Instructions Section 405.01 provides that:

1. SEPARATE ISSUE. A party who seeks to recover for (injuries) (death) (damages) must prove not only that the other party was negligent, but also that such negligence was (proximate) (direct) cause of the (injuries)(death)(damages).

2. DEFINED. (Proximate)(Direct) cause is an act or failure to act that in the natural and continuous sequence directly produced the (injury)(death)(physical harm) and without which it would have occurred.

**{¶69}** Ohio Jury Instructions Section 405.01 further defines proximate cause by defining a remote cause or condition as follows:

1.  A person not responsible for (injury)(damage) to another if his/her negligence is a remote (cause)(condition) and not a (proximate)(direct) cause.

2.  DEFINITION.  A (cause)(condition) is remote when the result could not have been reasonably foreseen or anticipated as being the likely cause of any (injury)(damage).

**{¶70}** The court's instruction on proximate cause closely mirrors the suggested instruction provided in Ohio Jury Instructions, which this court has found to be a correct statement of Ohio law.  *See Watkins v. Cleveland Clinic Found.*, 130 Ohio App.3d 262, 281, 719 N.E.2d 1052 (8th Dist.1998).  Therefore, we find no error in the instruction and no abuse of discretion.

**{¶71}** Accordingly, the sixth assignment of error is overruled.

**{¶72}** Judgment is reversed.  The matter is remanded for a new trial.

It is ordered that appellants recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY EILEEN KILBANE, JUDGE

MELODY J. STEWART, P.J., CONCURS;
COLLEEN CONWAY COONEY, J., DISSENTS (SEE SEPARATE DISSENTING OPINION)

COLLEEN CONWAY COONEY, J., DISSENTING:

{¶73} I respectfully dissent. I would affirm the jury verdict. This is a classic case of competing experts, and the jury chose to believe Metro's experts.

{¶74} As the majority noted, both Dr. Zimmerman and Dr. Volpe testified that they observed clots in the medullar veins in Joseph's CT and ultrasound scans. Dr. Zimmerman testified that he saw no evidence of trauma in Joseph's CT or MRI scans. Dr. Zimmerman further testified that there was no way in which this event would have been secondary to back blows.

{¶75} Appellants make no claim that Dr. Likavec's testimony was relevant to the issue of whether the administration of back blows by a nurse's aide was a violation of the applicable standard of care. At his discovery deposition, Dr. Likavec testified that he knew nothing about the job responsibilities of a newborn nurse's assistant in 1988 and did not have any role in the training of a nurse's assistant. Therefore, Dr. Likavec was not qualified to offer an opinion as to whether a nurse's aide's administration of back blows deviated from the standard of care.

**{¶76}** Appellants argue that Dr. Likavec would have testified that pain or trauma often causes an increase in blood pressure and that an increase in blood pressure could induce a hemorrhage. They claim that the exclusion of this evidence was fatal to their case. However, the record indicates that Dr. Likavec actually did testify that postpartum trauma could induce a hemorrhage like Joseph's. During appellants' questioning of Dr. Likavec, the court allowed appellants' counsel to cross-examine him with his deposition, and the court allowed them to ask some questions regarding proximate cause, albeit as hypotheticals. For example, appellants' counsel asked:

Q: If a newborn suffers some postpartum trauma, would they be more likely to suffer a germinal matrix bleed? What was your answer?

A: Yes, sir.

**{¶77}** Obviously, the jury knew counsel's reference to "postpartum trauma" referred to the alleged back blows as the cause of harm in the hypothetical question, because that was the ultimate issue in this case. Thus, despite their assertions on appeal, appellants were able to question Dr. Likavec on proximate cause.

**{¶78}** Furthermore, even if the court's limitation on Dr. Likavec's testimony was error, I would find it to be harmless in this case. This court recently held that error in the admission or exclusion of evidence is not grounds for reversal unless the error prejudiced the substantial rights of the complaining party. *Mason v. Pawloski*, 8th Dist. No. 95766, 2011-Ohio-3699, ¶ 20, citing Civ.R. 61; *O'Brien v. Angley,* 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980). In determining whether a substantial right has been affected, the reviewing court must decide whether the trier of fact would have reached the same

decision had the error not occurred. *Id*.

{¶79} Appellants contend that their inability to cross-examine Dr. Likavec "profoundly impaired" their medical malpractice claim. The majority agrees that his testimony held higher credibility because he was the treating physician and saw Joseph in the NICU.

{¶80} However, had appellants been permitted to ask Dr. Likavec more questions about proximate cause, his testimony would not have added any new evidence. First, Dr. Likavec's opinions, as presented in his depositions, are substantially the same as the opinions Dr. Snead offered in his trial testimony. Dr. Snead testified that, in his opinion, the pain and stress of the blows to Joseph's back caused an increase in heart rate and blood pressure, which precipitated the hemorrhage. As previously stated, the jury heard Dr. Likavec admit that postpartum trauma "would more likely" cause a germinal matrix bleed. Having already heard this testimony, any additional testimony Dr. Likavec could have provided would have been cumulative and, therefore, would not have changed the outcome of the case. Therefore, even if the trial court abused its discretion in limiting appellants' questioning of Dr. Likavec, I find it harmless error.

{¶81} In their second assignment of error, appellants argue the trial court abused its discretion by excluding the admission of Dr. Likavec's deposition testimony, which they offered to rebut Dr. Wiznitzer's opinion that the back blows did not cause Joseph's brain hemorrhage. The majority finds the exclusion of this necessary rebuttal evidence to be an abuse of discretion.

{¶82} Appellants claim Dr. Likavec's deposition testimony constituted rebuttal testimony to rebut a defense expert's response to a hypothetical question posed by appellants' counsel concerning how Dr. Likavec may testify at trial. The testimony was presented during appellants' cross-examination of the defense experts in the defendant's case. Because appellants elicited the subject matter of the proposed rebuttal testimony, appellants could not refute the matter with rebuttal testimony.

{¶83} Moreover, the proposed "rebuttal" topics were addressed during appellants' case-in-chief. In an effort to preemptively discredit the defense's theory, the following exchange took place between appellants' counsel and Dr. Lerer, appellants' pediatric expert:

> Q: Doctor, some on behalf of the defense might say that the first dusky episode was a sign of seizure and that was secondary to a bleed already underway. Do you have an opinion whether or not that is a valid position?
>
> A: I don't know. I don't think it's a valid position for the logical fact that * * * if that were the first sign of a hemorrhage, I would expect Joey to be in a coma, to have repeated seizures, to go downhill very, very quickly as he did at 25 hours of age.

{¶84} Appellants posed similar questions to Dr. Barnes, appellants' radiology expert, and Dr. Snead, appellants' pediatric neurologist. Both experts testified during appellants' case-in-chief that, in their opinions, the intraventricular hemorrhage most likely was not present when Joseph had his first blue spell episode. Thus, the proposed subject matter of the rebuttal testimony, i.e., that Joseph's hemorrhage started after the back blows, was first presented in appellants' case, and the trial court did not abuse its discretion in excluding the proposed rebuttal evidence.

**{¶85}** Moreover, as to the third assignment of error and the issue of unfair surprise, the instant case is analogous to *Wright v. Suzuki Motor Corp.*, 4th Dist. Nos. 03CA2, 03CA3, 03CA4, 2005-Ohio-3494, in which the expert witness offered an opinion at trial in terms of probability. The expert had previously expressed his opinion during deposition in terms of possibility. The appellate court held that the trial court did not abuse its discretion in allowing the testimony because the substance of the expert's opinion had not changed. The court, relying on *Faulk*, 1st Dist. Nos. C-765 and C-778, 2001 WL 1020749 (Sept. 7, 2001), stated as follows:

> We additionally find the reasoning set forth in *Faulk* applicable. [The expert's] opinion that the defective wheel was a proximate cause of the accident remained the same throughout the litigation. What changed, however, was his ability to include additional information for his consideration and to express his opinion within a reasonable degree of scientific certainty. Thus, like *Faulk*, this is not a case in which the expert was unable to give an opinion regarding causation during a deposition but did so at trial. It also is not a case in which the expert specifically changed his opinion or in which the substance of his testimony was revealed for the first time at trial and the opposing party had no reason to anticipate it.

*Wright* at ¶ 87.

**{¶86}** The substance of Dr. Martin's testimony at trial was no different than his deposition testimony. In both instances, Dr. Martin opined that coagulation was a possible cause of Joseph's brain damage. The only difference between his trial and pretrial testimony was the likelihood of the causation. As in *Wright* and *Faulk*, this is not a case in which the expert apparently had no opinion and then subsequently formed one, nor is it a case in which he changed the substance of his opinion. The idea that coagulation was a possible cause of Joseph's hemorrhage was not proposed for the first

time at trial.   Therefore, I would find no abuse of discretion and affirm the jury's verdict.