[Cite as *Gerace v. Cleveland Clinic Found.*, 2024-Ohio-2708.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

JAMES GERACE,                            :

    Plaintiff-Appellant,          :

                                   No. 113231

v.                                        :

CLEVELAND CLINIC                          :
FOUNDATION, ET AL.,

                            :

    Defendants-Appellees.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 18, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-926516

---

### *Appearances:*

Polk Kabat, LLP, Daniel M. Connell, and Shannon J. Polk,
*for appellant*.

Frantz Ward LLP, Michael N. Chesney, Christopher G.
Keim, and Megan E. Bennett, *for appellees*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Plaintiff-appellant, James Gerace, appeals the trial court's decision to grant summary judgment in favor of the defendants-appellees Cleveland Clinic Foundation ("CCF") and Jame Abraham, M.D. For the reasons that follow, we affirm.

{¶ 2} At all times relevant to this appeal, Abraham was a doctor practicing at CCF specializing in breast oncology. Gerace was formerly employed by Biotheranostics as a sales employee. Biotheranostics is a medical testing company; one of the company's products is the Breast Cancer Index ("BCI"). As a sales employee, Gerace was responsible for promoting and selling BCI to breast oncology medical providers within his service area.

{¶ 3} During Gerace's employment, BCI was a "growth product" for Biotheranostics. As part of his position, Gerace, an at-will employee, was responsible for developing relationships with key opinion leaders in his sales territory; Abraham was a key opinion leader in Gerace's sales territory.

{¶ 4} In August 2019, CCF hosted a breast cancer summit ("summit") for health care providers focused on treatment options for breast cancer. Biotheranostics was a sponsor of the summit, and Gerace attended as a company representative.

{¶ 5} Abraham gave a presentation at the summit titled "2019 Breast Cancer NCCN Guidelines Update" to update attendees on the National Comprehensive Cancer Network's ("NCCN") guidelines for cancer care. Doctors and insurers

routinely relied on NCCN guidelines when making treatment and coverage decisions.[1] Abraham was member of the NCCN Breast Cancer Panel ("panel") and routinely involved in confidential discussions regarding guidelines for the treatment of breast cancer. Pharmaceutical and medical device companies like Biotheranostics worked to have their products included in the NCCN Guidelines and, understandably, wanted their products to be ranked as high as possible in those guidelines.[2]

{¶ 6} Biotheranostics' BCI was included in the 2019 Breast Cancer NCCN Guidelines with "Category 2A evidence for 'Consideration of Addition of Adjuvant Systemic Chemotherapy to Adjuvant Endocrine Therapy.'" The guidelines noted that it had "not [been] determined" whether the BCI was "predictive" of a future recurrence of breast cancer.

{¶ 7} Sometime in 2019, Biotheranostics submitted additional data to the NCCN, with the hopes that it would elevate the BCI's category. In August 2019, a week prior to the summit, the panel convened but results of the panel meeting were not slated to be disclosed for months. Biotheranostics' salespeople were instructed not to discuss a product's positioning in the NCCN guidelines with panel members.

---

[1] The National Comprehensive Cancer Network ("NCCN") is a nonprofit organization focusing on patient care, research, and education.

[2] The NCCN ranks products as Category 1, Category 2A, Category 2B, or Category 3.

{¶ 8} During his presentation at the summit, Abraham stated that there was data supporting the use of the BCI as an appropriate test for certain patients, but current NCCN guidelines did not endorse using the index to determine the use of extended endocrine therapy.

{¶ 9} Gerace approached Abraham after his presentation. Gerace was aware that the panel had recently met and admitted that he was "anxiously" hoping for positive news about the BCI's positioning in the guidelines.

{¶ 10} According to Abraham, Gerace's demeanor during the encounter was "red-faced" and Gerace was in his personal space and pointing his finger at him. Abraham felt pressured regarding confidential panel deliberations because of his conversation with Gerace. A fellow breast cancer oncologist who witnessed the encounter described Gerace as "chasing Abraham as he was trying to leave, putting the doctor into a 'fight-or-flight' mode."

{¶ 11} After their encounter, Gerace left a note on Abraham's chair. In the note, Gerace apologized to Abraham stating, in part, "I understand that the [NCCN] review is proprietary and confidential — as it should be and am sorry if my lack of clarity caused any concern."

{¶ 12} Following the interaction with Gerace, Abraham reached out to Biotheranostics and spoke with the vice president of marketing, Lisa Whitmyer. This was not the first time Abraham had contacted Biotheranostics to discuss Gerace's concerning behavior. On a prior occasion, Abraham contacted

Biotheranostics to complain about Gerace's aggressive sales tactics with CCF's cancer doctors.

{¶ 13} Abraham told Whitmyer he was worried about "his personal safety" and therefore was "done with Biotheranostics." Whitmyer concluded that Gerace's behavior towards Abraham left the doctor "very upset" and "fearful." Nevertheless, Abraham told Whitmyer that he did not want the company to take any action against Gerace — Abraham specifically asked Whitmyer to not take punitive action against Gerace. Whitmyer testified that Abraham "was adamant that we take no action" and that Abraham "went so far as to say, 'I do not want him fired.'" Abraham was described by a coworker several days after the encounter as "still very rattled" and "visibly scared."

{¶ 14} Biotheranostics subsequently terminated Gerace's employment. The company concluded that Gerace had had previous issues at CCF, had improperly attempted to speak with a NCCN panel member about the NCCN Guidelines, and the salesman's actions had left Abraham shaken.

{¶ 15} Gerace subsequently filed suit against his former employer in California and against CCF and Abraham in Cuyahoga County Common Pleas Court. The California court determined that it was not the proper forum and dismissed Gerace's complaint against Biotheranostics. Gerace refiled against Biotheranostics in Cuyahoga County Common Pleas Court, alleging violations of California law and wrongful discharge in violation of Ohio public policy. Biotheranostics filed a motion to dismiss Gerace's complaint, which the trial court granted. Gerace appealed. This

court affirmed the trial court's decision, agreeing that Gerace could not set forth claims under California law in Ohio and was unable to establish a claim for wrongful discharge in violation of public policy. *Gerace v. Biotheranostics, Inc.*, 2022-Ohio-302 (8th Dist.).

{¶ 16} In the instant case, Gerace's complaint alleged tortious interference with a business or employment relationship. CCF and Abraham moved for summary judgment. The trial court granted the motion, finding that no genuine issue of material fact remained and reasonable minds could only come to one conclusion, which was adverse to Gerace.

{¶ 17} Gerace filed the instant appeal.

I. The trial court erred by granting summary judgment in favor of CCF/Abraham with no factual or legal analysis, thus impermissibly overlooking, failing to credit, and/or weighing evidence in a manner adverse to Plaintiff-Appellant James Gerace at the summary judgment stage.

II. The trial court erred by finding that communications between counsel for CCF/Abraham and counsel for Biotheranostics (BTX) were shielded from disclosure by the common-interest privilege.

III. The trial court erred by failing to conduct an evidentiary hearing or in camera review before finding that communications between counsel for CCF/Abraham and counsel for BTX were protected from disclosure by the common-interest privilege.

IV. The trial court erred by failing to require CCF/Abraham to provide a privilege log detailing documents withheld during discovery as privileged.

{¶ 18} We first consider the second, third, and fourth assignments of error and combine them for review. In these assigned errors, Gerace argues that the trial

court erred in failing to enforce disclosure of communications between Biotheranostics, CCF, and respective counsel during discovery.

{¶ 19} During discovery, Gerace subpoenaed Biotheranostics, requesting the following:

> For the time period August 1, 2019, through the present, please produce any and all communications between Biotheranostics, Inc. and the Cleveland Clinic that relate to this lawsuit or James Gerace. This request specifically includes, but is not limited to, documents and/or communications exchanged between counsel for Biotheranostics and counsel for the Cleveland Clinic.

{¶ 20} Gerace also requested:

> For the time period August 23, 2019, through the present, please produce any and all communications between The Cleveland Clinic Foundation and any agent or representative of Biotheranostics that relates to Jim Gerace, his employment with Biotheranostics, and/or any litigation he brought against the Cleveland Clinic or Biotheranostics. This request specifically includes, but is not limited to, communications between counsel for Cleveland Clinic Foundation and counsel for Biotheranostics (including any successor entity).

{¶ 21} CCF did not turn over the requested documents, and Gerace moved to compel discovery. The trial court denied Gerace's motion to compel finding that "the common-interest doctrine precludes discovery of communication between counsel for the Clinic and counsel for Biotheranostics."

{¶ 22} Ohio law recognizes the common-interest doctrine as a corollary to the attorney-client privilege and work-product doctrine. *Condos at Stonebridge Owners' Assn v. K&D Group, Inc.*, 2014-Ohio-503, ¶ 15 (8th Dist.). The common-interest doctrine is designed to "encourage the parties to make full and adequate disclosure to the attorneys who, jointly, have been tasked with accomplishing the

legal interests of their respective clients." *Fresenius Med. Care Holdings v. Roxane Labs. Inc.*, 2007 U.S. Dist. LEXIS 98216, 5-7 (S.D. Ohio Mar. 21, 2007) (finding that the common-interest doctrine permits "persons with similar legal interests, but represented by different counsel, to enjoy the same ability to communicate confidentially about their common-interests with multiple attorneys that each client enjoys separately").

{¶ 23} The common-interest doctrine is an extension of the attorney-client privilege and work-product doctrine. It is not an independent source of privilege or confidentiality. *Bitler Invest. Venture II, LLC v. Marathon Ashland Petro. LLC*, 2007 U.S. Dist. LEXIS 9231 (N.D. Ind. Feb. 7, 2007). If a communication or document is not otherwise protected by the attorney-client privilege or work-product doctrine, the common-interest doctrine has no application. *Stonebridge Owners' Assn.* at ¶ 15.

{¶ 24} Thus, the common-interest doctrine protects documents and communications from discovery if two conditions are satisfied: (1) the documents or communications were shared between parties with a common legal interest or who are represented by the same attorney and (2) the documents or communications are protected by the attorney-client privilege and/or work-product doctrine.

{¶ 25} Gerace argues that CCF was required to expressly invoke the common-interest privilege in response to his subpoena to Biotheranostics or his discovery request and failed to do so. We disagree. The common-interest doctrine

is not a standalone privilege. "The common-interest doctrine operates as an exception to the general rule that disclosure of privileged materials to a third party waives the privilege. This exception typically arises when parties 'are either represented by the same attorney or are individually represented but have the same goal in litigation.'" *Stonebridge Owners' Assn.* at *id.* Here, Gerace requested communications between counsel for CCF and Biotheranostics. Attorneys for CCF responded with both a general objection to the production of any privileged materials, as well as a specific objection to the request at issue, stating that the request impermissibly sought "documents or communications protected by attorney-client privilege and/or the work-product doctrine."

{¶ 26} Gerace relies on cases from other states, which require that the parties to the lawsuits be identical. In Ohio, there is no such requirement. Here, both CCF and Biotheranostics are defending claims Gerace brought in litigation involving the same operative facts, that being Gerace's termination from Biotheranostics. There is no requirement that the parties be in the same lawsuit for the doctrine to apply — the question is whether they share a common-interest. "It is not necessary that a common legal interest be derived from legal action; it is possible for two or more parties to share a common-interest without becoming parties to the same litigation." *Cooey v. Strickland*, 269 F.R.D. 643, 652-53 (S.D. Ohio 2010) (common-interest doctrine applied where "the attorneys * * * communicated among themselves with a common-interest and were proceeding jointly to analyze Ohio's existing and

proposed execution protocols"). Gerace filed suit against both Biotheranostics and CCF/Abraham and both cases involved common witnesses and evidence.

{¶ 27} We next consider whether the requested documents fall under the work-product exception. "The purpose of the work-product rule is (1) to preserve the right of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases and (2) to prevent an attorney from taking undue advantage of his [or hers] adversary's industry or efforts." *Decuzzi v. Westlake*, 2010-Ohio-6169 (8th Dist.). The work-product privilege "protects the attorney's mental processes in preparation of litigation, so that the attorney can analyze and prepare their client's case free from scrutiny or interference by an adversary." *Watson v. Cuyahoga Metro. Hous. Auth.*, 2014-Ohio-1617, ¶ 29 (8th Dist.). It is intended to create "'a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary.'" *Squire, Sanders & Dempsey, LLP v. Givaudan Flavors Corp.*, 2010-Ohio-4469 (8th Dist.), quoting *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006).

{¶ 28} The work-product privilege is "broader than the attorney-client privilege" and "protects from disclosure documents prepared by or for an attorney in anticipation of litigation." *Galati v. Pettorini*, 2015-Ohio-1305, ¶ 24 (8th Dist.). "The test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been

prepared or obtained because of the prospect of litigation." *Estate of Hohler v. Hohler*, 2009-Ohio-7013 (7th Dist.). We find that Gerace's discovery requests were communications between attorneys who shared a common legal interest and are covered by the work-product doctrine.

{¶ 29} Next, Gerace claims that the trial court erred by failing to conduct an in camera review of the communications between counsel for CCF and Biotheranostics. A trial court is not required to conduct an in camera review; it is within the trial court's discretion whether to hold the review. *See State v. Hoop*, 134 Ohio App.3d 627, 639 (12th Dist. 1999); *see also Marcum v. Miami Valley Hosp.*, 2015-Ohio-1582 (2d Dist.) (noting that an in camera review "is not always required, and the trial court does have discretion to consider and order alternative options"). This court has recognized that "the discovery process should be kept as simple as possible and [] a trial court does not need to conduct an in camera review in every instance that a privilege is asserted. . . . An in camera inspection is not necessary when there is no 'factual basis' justifying the trial court's in camera review." *Pinnix v. Marc Glassman, Inc.*, 2012-Ohio-3263, ¶ 11 (8th Dist.).

{¶ 30} In *Yoe v. Cleveland Clinic Found.*, 2003-Ohio-875 (8th Dist.), the plaintiff sued CCF for medical malpractice in connection with two bladder surgeries. After a jury found in favor of CCF, the plaintiff appealed and argued the trial court erred by failing to conduct an in camera inspection of surgical records that the plaintiff alleged he needed to challenge the credibility of the surgeon. This court disagreed, explaining that a party is not entitled, as a matter of right, to an in camera

hearing when privilege is asserted. "Before engaging in an in camera review to determine whether privilege is applicable, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person' that in camera review of the materials is outweighed by other rights.'" *Id*. at ¶ 2, quoting *Hoop*.

{¶ 31} Here, Gerace failed to demonstrate that his alleged need for the communications between counsel outweighed the interest in preserving the attorney-client privilege and work-product protection. Given the trial court's inherent discretion, it was not required to conduct an in camera review of the privileged communications to determine if there was merit to Gerace's claims.

{¶ 32} We further find that counsel for CCF was not required, as Gerace argues, to create a privilege log reflecting communications with counsel for Biotheranostics. The communications at issue were generated after litigation was filed and presumably would not exist but for the litigation against both entities. As such, the communications are presumptively privileged and Gerace was not entitled to a privilege log identifying every communication. *See Cleveland Botanical Garden v. Drewien*, 2020-Ohio-1278 (8th Dist.) (upholding the trial court's finding that there was no need to log communications between counsel for two parties that shared a common legal interest because the "basis of the parties' privilege claims was made clear" to the opposing party). CCF informed Gerace of the basis for its objections to production in its discovery responses; therefore, there was no need to create a log involving all communications between counsel.

{¶ 33} Accordingly, the second, third, and fourth assignments of error are overruled.

{¶ 34} In the first assignment of error, Gerace claims that the trial court erred in granting summary judgment in favor of CCF and Abraham.

{¶ 35} Appellate review of an award of summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (9th Dist. 1996). Summary judgment is appropriate under Civ.R. 56 when (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (3d Dist. 1977), citing Civ.R. 56(C). A court must view the facts in the light most favorable to the nonmoving party and must resolve any doubt in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359 (10th Dist. 1992).

{¶ 36} Gerace claims that CCF and Abraham caused his termination by tortiously interfering in his relationship with his employer. Tortious interference with an employment relationship "occurs when one party to the relationship is induced to terminate the relationship by the malicious acts of a third person who is not a party to the relationship at issue." *Tessmer v. Nationwide Life Ins. Co.*, 1999 Ohio App. LEXIS 4633, *6 (10th Dist. Sept. 30, 1999). To establish the claim, a plaintiff must demonstrate (1) the existence of an employment relationship between

plaintiff and the employer; (2) that the defendant was aware of this relationship; (3) that the defendant intentionally interfered with this relationship; and (4) that the plaintiff was injured as a proximate result of the defendant's acts. *Lennon v. Cuyahoga Cty. Juvenile Court*, 2006-Ohio-2587, ¶ 19 (8th Dist.), citing *Costaras v. Dunnerstick,* 2004-Ohio-6266 (9th Dist.).

{¶ 37} To succeed on his claim, Gerace was required to establish that Abraham affirmatively intended to cause his termination. The interference must be intentional because "Ohio does not recognize negligent interference with a business relationship." *MedCorp, Inc. v. Mercy Health Partners*, 2009-Ohio-988, ¶ 17 (6th Dist.), citing *Smith v. Ameriflora*, 96 Ohio App.3d 179, 186 (10th Dist. 1994).

{¶ 38} Gerace argues that there was ample evidence from which a jury could find that Abraham intended for Gerace to be terminated. Gerace alleges that it was Abraham's, not his own, conduct that got him fired. According to Gerace, Abraham escalated his complaints about Gerace until Biotheranostics fired Gerace. A review of the record does not support Gerace's claim.

{¶ 39} Abraham contacted Whitmyer after the encounter to inform her that he would no longer work with Biotheranostics. By all accounts, Abraham was very upset about the encounter and fearful of Gerace. But Abraham specifically told Whitmyer that he did not want Gerace fired. Whitmyer testified at deposition that Abraham "was adamant we take no action" and told her "I do not want him fired."

{¶ 40} Second, Gerace claims Abraham lied in his communications with Whitmyer. Abraham told Whitmyer that he had not said anything at the summit

about NCCN approval of the BCI. But, at deposition, Abraham admitted that he had stated at the summit that the BCI was not endorsed by NCCN. Thus, according to Gerace, Abraham was trying to secure Gerace's termination by providing false information to Biotheranostics.

{¶ 41} As mentioned, during Abraham's presentation at the summit, he stated that there was data supporting the use of the BCI as an appropriate test for certain patients, but current NCCN guidelines did not endorse using the index to determine the use of extended endocrine therapy.

{¶ 42} Shortly before the summit, Abraham and other NCCN members met to discuss updates to the deadlines, which would be released in the fall of 2023. There is no evidence that Abraham told a falsehood or was trying to get Gerace fired by providing false information; as of the date of the summit, NCCN Guidelines did not endorse the use of the BCI as a predictor of recurrence.

{¶ 43} Gerace also argues that Abraham's claim that the doctor feared for his personal safety is not to be believed because the doctor never claimed that Gerace verbally threatened him and did not report the altercation to the police. We recognize that one can feel fear for his or her personal safety even if the person he or she fears does not issue a verbal threat. Abraham testified that Gerace invaded his personal space, pointed at him, and was "red-faced." A coworker described Abraham as "still very rattled" and "visibly scared" several days after the encounter.

{¶ 44} In *Sawyer v. Devore*, 1994 Ohio App. LEXIS 4954 (8th Dist. Nov. 3, 1994), defendant Wal-Mart conducted an audit of the work performed by the

plaintiff, who was a claims officer of the company CSI that processed Wal-Mart's workers' compensation claims. Following the audit, Wal-Mart recommended that a different CSI claims officer be given exclusive responsibility for handling Wal-Mart's accounts and plaintiff be moved into a supporting role. *Id.* at 4. Despite 14 years of praiseworthy performance evaluations, CSI terminated the plaintiff's employment, allegedly because the claims manager at Wal-Mart did not like the plaintiff. *Id.* at 4-5.

{¶ 45} This court affirmed summary judgment for both Wal-Mart and the claims manager, finding that the plaintiff failed to establish prima facie intent on the part of the claims manager or Wal-Mart to injure the plaintiff, i.e., intent on the part of the claims manager or Wal-Mart to cause CSI to terminate the plaintiff's business relationship with CSI. *Id.* at 34. In reaching this conclusion, this court considered that neither Wal-Mart nor the claims manager requested or recommended CSI terminate the plaintiff; therefore, summary judgment was appropriate. *Id.* at 35-36.

{¶ 46} Here, neither Abraham nor CCF requested that Biotheranostics terminate Gerace; Abraham specifically told Biotheranostics *not* to fire Gerace.

{¶ 47} To support his claim that threats to discontinue doing business with an employer are sufficient to support a claim for tortious interference, Gerace cites an out-of-state case, *Riley v. Prescott*, 2014 LEXIS 20511, *42 (D. Ariz. Feb. 18, 2014), where the plaintiff claimed she was terminated after the mayor threatened economic harm against her employer based on the plaintiff's public protests against

the mayor. The court found facts in dispute and denied summary judgment. The case, from Arizona, is neither binding nor persuasive.

**{¶ 48}** Considering the above, Gerace has failed to show a genuine issue of material fact remains to withstand CCF and Abraham's motion for summary judgment.

**{¶ 49}** The first assignment of error is overruled.

**{¶ 50}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

SEAN C. GALLAGHER, J., CONCURS;
MICHELLE J. SHEEHAN, P.J., DISSENTS (WITH SEPARATE OPINION)

MICHELLE J. SHEEHAN, P.J., DISSENTING:

**{¶ 51}** With respect, I dissent from the majority's resolution of the first assignment of error. The de novo standard of review for summary judgment requires us to fully consider the evidence presented by the parties. My review of the evidence in this case reveals a closer question than reflected in the majority opinion

regarding whether there exists a genuine issue of material fact for jury consideration.

{¶ 52} "Civ.R. 56(C) provides that summary judgment shall be granted when the filings in the action, including depositions and affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 2002-Ohio-2220, ¶ 24. A genuine issue of material fact exists to prevent summary judgment only if "a reasonable jury could find that the evidence satisfies the evidentiary standards required at trial." *Myocare Nursing Home, Inc. v. Fifth Third Bank*, 2003-Ohio-2287, ¶ 33.

{¶ 53} To establish a claim of tortious interference with an employment relationship, a plaintiff must prove "(1) the existence of an employment relationship between plaintiff and the employer; (2) the defendant was aware of this relationship; (3) the defendant intentionally interfered with this relationship; and (4) the plaintiff was injured as a proximate result of the defendant's acts." *Hester v. Case W. Res. Univ.*, 2017-Ohio-103, ¶ 37 (8th Dist.). Tortious interference with an employment relationship occurs when a party to the employment relationship is induced to terminate the relationship by the malicious acts of a third person (who is not a party to the employment relationship). *Morris v. Broska*, 2019-Ohio-2510, ¶ 19 (11th Dist.), citing *Tessmer v. Nationwide Life Ins. Co.*, 1999 Ohio App. LEXIS 4633, *21 (10th Dist. Sept. 30, 1999). *See also Hetmanski v. Doe*, 2017-Ohio-7220, ¶ 29 (11th Dist.) (tortious interference with employment requires evidence of wanton or

malicious conduct); *Slyman v. Shipman, Dixon & Livingston, Co., L.P.A.*, 2009-Ohio-4126, ¶ 11 (2d Dist).

**{¶ 54}** The factual issues in the instant summary judgment proceeding concern whether Dr. Abraham intentionally interfered with Gerace's employment with Biotheranostics and whether Dr. Abraham acted in a malicious manner. On appeal, we are to determine whether the evidence before the trial court creates a genuine issue of material fact regarding these elements of Gerace's tortious interference claim. In making that determination, we are to bear in mind that "[i]n reviewing a motion for summary judgment, the evidence must be construed most strongly in favor of the nonmoving party." *Bliss v. Manville*, 2022-Ohio-4366, ¶ 13, quoting *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66-67 (1978). Furthermore, "[i]t is axiomatic that in construing evidence most strongly in favor of the nonmoving party, a court may not ignore evidence in that party's favor." *Id.*

**{¶ 55}** Gerace was considered a successful and respected salesperson in his company and in the oncology community. When he was hired by Biotheranostics in 2016, he brought with him strong relationships he had developed with the local and national oncology community. He was described by various oncologists as a sales representative who "showed the highest integrity," always "honest and straightforward," gave "excellent customer service," and was "respected in the academic physician community." His supervisors at Biotheranostics considered him "very professional" and "a top performer." Merely three months before the breast cancer summit, he received a glowing job review from Whitmyer, who

described him as "a pleasure to manage and work with" and stated that she would not want to work with anyone else managing the Northeast Ohio market. Gerace received a pay raise and was told to "keep up the good work." A month before the summit, another supervisor wrote that he had the "utmost confidence" in Gerace and that the company was "lucky" to have him.

{¶ 56} However, within months of receiving the positive feedback from Biotheranostics, Gerace was summarily terminated hours after Dr. Abraham complained to his supervisors about his behavior during a break at the summit.

{¶ 57} During his presentation at the summit, Dr. Abraham stated there was data supporting the use of the BCI as a test for certain patients, but the current NCCN guidelines did not endorse the use of the test to determine whether to extend endocrine therapy for a breast cancer patient.

{¶ 58} Gerace testified at his deposition that, after Dr. Abraham's presentation, as the attendees were leaving the conference room for a break, Dr. Abraham caught his eye and Gerace took the opportunity to "thank him for the presentation and the positive comments that he made about the BCI." To Gerace's surprise, Dr. Abraham was highly agitated at his remark, sputtering to Gerace something to the effect of "you are upset with me" and "you are twisting my words."

{¶ 59} According to Gerace, he was shocked and baffled by Dr. Abraham's strong reaction to his innocuous comments. To reassure him, he said to Dr. Abraham, "I am not asking for specifics about [NCCN's] deliberations. I understand the sanctity and the proprietary nature of that and I would never put

you in that position." According to Gerace, the two of them were separated by a table and stood five to eight feet apart. The encounter lasted no more than two to three minutes. Afterwards, he wrote a note to Dr. Abraham and left it on Dr. Abraham's chair at the lecture hall. The note states, "I was sincerely attempting to thank you for your positive comments about the [BCI]. . . . I also appreciated your comments relative to it not being approved by NCCN. I understand that the review is proprietary and confidential — as it should be, and I am sorry if my lack of clarity caused any confusion."

{¶ 60} Dr. Abraham described the encounter differently. While he acknowledged that Gerace did not make a verbal threat, Dr. Abraham testified that he was "scared" by Gerace's demeanor — Gerace was "visibility upset, and his face was red, and he was angry." He testified that Gerace came within two feet of him and pointed his finger at him. Gerace kept asking him if NCCN endorsed the new data about the BCI Biotheranostics sent to NCCN, and he responded that he could not talk about it. When asked at the deposition why he no longer wished to engage in projects with Biotheranostics, Dr. Abraham stated that "Jim Gerace threatened me, and for my personal safety, I don't want to work with him."

{¶ 61} Within hours of that short encounter, Biotheranostics decided to terminate Gerace. When Dr. Abraham saw the note left by Gerace, he took a picture of it and sent it to Whitmyer at 1:05 p.m.; the message accompanying the picture reads: "I am scared of him. I mean it. He is twisting my words. I didn't say anything about NCCN approval or not. I am really scared of him." At 1:22 p.m., Dr. Abraham

emailed another Biotheranostics employee and copied Whitmyer, stating, "I am not interested in working with Biotheranostics in the future, in any manner. So no need to contract [sic] me or make appointments with me in the future. Sorry about it. I am done with Biotheranostics."

{¶ 62} Soon after, at 2:04 p.m., Whitmyer text messaged Dr. Abraham, assuring him that Gerace "will never interact with [him] again" and asking him to call her at the end of day or the next day regarding the matter. At 2:27 p.m., Dr. Abraham text messaged her, saying "I will call you. But I am done with Biotheranostics. Sorry I will tell my group too." At 2:29 p.m., Whitmyer responded: "I can ensure you never and I mean never deal with him." At 2:33 p.m., Dr. Abraham wrote to Whitmyer: "I am worried about my personal safety. I mean it." At 2:30 p.m., Whitmyer wrote to tell Dr. Abraham that "we [the executive team] are discussing how we handle this situation as we speak."

{¶ 63} Whitmyer testified that a decision was made at the executive meeting to terminate Gerace. Shortly after the meeting, around 5 p.m., Dr. Abraham and Whitmyer talked over the phone. He told her he did not want Gerace fired, saying, "He is a bully, and I don't want any backlash." According to Whitmyer, she did not reveal to him that the company had decided to terminate Gerace.

{¶ 64} The majority concludes that summary judgment was properly granted because Dr. Abraham specifically told Whitmyer not to terminate Gerace during the phone call and, therefore, there is no genuine issue of material fact for trial regarding the element of intent. I disagree.

{¶ 65} The courts have held that circumstantial evidence can be used to show intent. *Seitz v. Harvey*, 2015-Ohio-122, ¶ 33 (2d Dist.), citing *Doyle v. Fairfield Machine Co., Inc.*, 120 Ohio App.3d 192, 208 (11th Dist. 1997). Circumstantial evidence is evidence that can be "'inferred from reasonably and justifiably connected facts'" *Hinerman v. Grill on Twenty First, L.L.C.*, 2021-Ohio-859, ¶ 88 (5th Dist.), quoting *State v. Fairbanks*, 32 Ohio St.2d 34 (1972), paragraph five of syllabus. Intent is not always "subject to direct evidence 'because it is seldom possible to determine the exact condition of someone's mind. Intent must be determined from inferences drawn from direct fact.'" *Cuyahoga Falls v. Ellenberger*, 2003-Ohio-6578, ¶ 16 (9th Dist.), quoting *Dayton v. Davidson* 1985 Ohio App. LEXIS 9592 (2d Dist. Dec. 9. 1985). "'Intent can be established by circumstantial evidence. Intent must be ascertained from the surrounding facts and circumstances in the case.'" *Id.,* quoting *State v. Wilson*, 1988 Ohio App. LEXIS 555 (8th Dist. Feb. 25, 1988).

{¶ 66} The evidence produced by Gerace shows that Dr. Abraham began to contact employees of Biotheranostics' sales division around 2 p.m., soon after their encounter. In a span of approximately 90 minutes, he sent one email and three text messages to Gerace's supervisors, using strong language such as "I am really scared of him," "I am not interested in working with Biotheranostics in the future, in any manner," and "I am done with Biotheranostics." The text messages did not stop after Whitmyer assured him that he would never have to interact with Gerace again. Even with that assurance, Dr. Abrahm reiterated that he was "done with Biotheranostics" and that he would "tell my group." The persistent text messages to

the Biotheranostics executives only ceased when Dr. Abraham was told by Whitmyer that the executives were currently meeting to address the situation. Notably, in none of those messages did Dr. Abraham express a request or wish that Gerace was not to be terminated.

{¶ 67} Construing the evidence most strongly in favor of the nonmoving party, I find the foregoing evidence, albeit circumstantial, creates a genuine issue of material fact regarding intent, because the evidence could permit a reasonable jury to infer that Dr. Abraham exerted influence and pressure on Gerace's supervisors and intentionally interfered with the employment relationship between Gerace and his employer.

{¶ 68} I also find the evidence presented creates a genuine issue of material fact regarding whether Dr. Abraham acted with malice. Malice can either be "behavior characterized by hatred, ill will, or a spirit of revenge" or "extremely reckless behavior revealing a conscious disregard for a great and obvious harm." *Preston v. Murty*, 32 Ohio St.3d 334, 335 (1987). As with intent, "'malice may be inferred from conduct and surrounding circumstances.'" *Hetmanski*, 2017-Ohio-7220, at ¶ 29 (11th Dist.), quoting *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 183 (1975).

{¶ 69} The evidence reflects that Dr. Abraham felt threatened by Gerace and his conduct appears to be motivated by fear rather than by "hatred, ill will, or a spirit of revenge." However, after Dr. Abraham was reassured twice by Whitmyer that he would never have to interact or deal with Gerace again, Dr. Abraham continued to

complain about Gerace, telling Whitmyer he feared for his personal safety. The evidence, likewise circumstantial, is sufficient to create a genuine issue of material fact regarding whether Dr. Abraham's conduct constituted "extremely reckless behavior revealing a conscious disregard for a great and obvious harm" to Gerace.

{¶ 70} My review of the evidence presented by both parties therefore indicates there exists a jury question regarding whether Dr. Abraham intentionally interfered with Gerace's employment with Biotheranostics and whether he acted with malice. Accordingly, I would sustain the first assignment of error and reverse the trial court's decision granting summary judgment in favor of appellees.

{¶ 71} For the foregoing reasons, I dissent.