[Cite as *Kittis v. Cleveland Clinic Found.*, 2026-Ohio-828.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

GERALDINE KITTIS,                      :

    Plaintiff-Appellant,         :

                        No. 114990

    v.                          :

THE CLEVELAND CLINIC
FOUNDATION,                            :

    Defendant-Appellee.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 12, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-920144

---

### *Appearances:*

Elk & Elk Co., Ltd., James M. Kelley, III, Marilena Disilvio, and Antonia Mysyk, *for appellant.*

Roetzel & Andress, LPA, Stephen W. Funk, Emily K. Anglewicz, and Joseph E. Herbert, *for appellee.*

SEAN C. GALLAGHER, P.J.:

{¶ 1} Geraldine Kittis ("Kittis"), individually and as the administrator for the estate of Mr. Dennis Kittis ("Mr. Kittis"), appeals the jury verdict in favor of the

Cleveland Clinic Foundation ("the Clinic") following a trial on wrongful-death and medical-malpractice claims. For the following reasons, we affirm.

{¶ 2} There is an overarching issue framing this appeal: whether the cause of a specific condition, bowel ischemia, was part of the proximate cause element of the claims presented at trial. In an earlier appeal, as will be further discussed, the panel concluded that summary judgment was improperly granted to the Clinic because Kittis presented genuine issues of material fact that had the Clinic completed a second surgery earlier, Mr. Kittis's death would have been avoided. *Kittis v. Cleveland Clinic Found.*, 2024-Ohio-659, ¶ 40 (8th Dist.) ("*Kittis I*"). The inability of the plaintiff's expert to opine to a reasonable degree of medical certainty about the cause of a condition in the bowel, called ischemia, was deemed irrelevant. *Id.* at ¶ 43. According to *Kittis I*, which is the law of this case, in granting summary judgment the Clinic (and the trial court) incorrectly "focused on the cause of [Mr. Kittis's] ischemic bowel and thereby neglected to address the actual issue of proximate causation." *Id.* As expressly concluded, "The focus should have been on . . . the Clinic's failure to recognize the meaning of [the] acidosis and renal dysfunction and initiate a second surgery[,]" which was "the proximate cause of [Mr. Kittis's] injuries and death." *Id.*

{¶ 3} The cause of the bowel ischemia was deemed irrelevant to the question remaining for trial, which was whether the applicable standard of care was breached by the Clinic's failure to initiate a surgery earlier in the day than when the surgery was performed.

**{¶ 4}** According to the trial record, Mr. Kittis was hospitalized for a bowel obstruction and had a preexisting heart condition. He underwent surgery to remove the obstruction, during which one of the surgeons unintentionally punctured Mr. Kittis's intestines, a complication that was not part of Kittis's allegations against the Clinic. The wound was addressed during the surgery, which was deemed successful. One day later, Mr. Kittis began experiencing low blood pressure and high lactate levels initially thought to be caused by dehydration, which was treated with IV fluids. Lactate is produced when tissue in the body is not getting sufficient oxygen. There were also issues with his urine output. When his symptoms did not improve, a computerized tomography scan ("CT scan") was ordered. The CT scan was cancelled by Dr. Julia Muntean, who was under the authority of Dr. Toms Augustin, Mr. Kittis's treating physician. Dr. Augustin testified that in his opinion, the CT scans were not proper because "it's actually a bad idea to give someone who is anuric, not making urine, to get a CT scan with IV contrast." The following day, Mr. Kittis exhibited an even lower blood pressure that was treated with intubation and two vasopressors.

**{¶ 5}** In light of the worsening conditions, Mr. Kittis underwent a laparotomy performed by Dr. Augustin. The laparotomy was an exploratory surgery used to potentially identify the root cause of Mr. Kittis's declining condition, believed to have been caused by complications with the earlier bowel surgery. Although Dr. Augustin observed what he described as a "moderately dusky bowel," which according to him, indicates a mild form of ischemia caused by the lack of

blood flow to the bowel, he found no evidence of a surgically repairable condition causing that ischemia. He maintained that Mr. Kittis was experiencing global hypoperfusion, which causes decreased blood flow to all organs and would also cause mild ischemia in the bowel. Ischemia is a condition caused by the lack of or decrease in blood flow to an organ. Mr. Kittis tragically succumbed to his deteriorating condition at the age of 74.

{¶ 6} Kittis's theory of negligence centered upon her allegation that the Clinic should have ordered a CT scan or performed an exploratory surgery immediately after Mr. Kittis began to show signs of low blood pressure to rule out a surgically correctable bowel ischemia, instead of cancelling the CT scans and waiting to perform the exploratory surgery until later in the day. As previously mentioned, this theory was the focus of the earlier appeal with regard to the expert testimony Kittis anticipated presenting at trial. *Kittis I.*

{¶ 7} The first appeal involved the granting of summary judgment in favor of the Clinic based on Kittis's expert's then failure to opine to a reasonable degree of medical certainty as to the cause of bowel ischemia, which again, is caused by inadequate blood flow to the bowel. Kittis believed that the cause of the bowel ischemia was surgically correctable and the failure to detect that led to Mr. Kittis's worsening condition and death. The trial court granted a motion in limine to preclude Dr. David Brooks, Kittis's expert, from testifying at trial because he

> failed to state with a reasonable degree of medical probability that (1) one of the etiologies [causes] — torsion, a blood clot, or venous obstruction — were findable, identifiable, and repairable causes of [Mr.

Kittis's] bowel ischemia or (2) one of the three named etiologies was the most probable cause of [Mr. Kittis's] bowel ischemia and that with surgical intervention earlier than midnight on January 6, 2018 the cause would have been findable, identifiable, and surgically repairable.

*Id.* at ¶ 10. Summary judgment was then granted in favor of the Clinic because ultimately, "Kittis's expert witness, Dr. Brooks, failed to provide expert testimony to a reasonable degree of medical probability that the alleged breach in the standard of care by the Clinic proximately caused death or injury to [Mr. Kittis]." *Id.* at ¶ 12.

**{¶ 8}** The *Kittis I* panel disagreed and concluded "that Dr. Brooks's expert testimony was sufficient to establish that the Clinic's failure to recognize in a timely fashion the progressive acidosis and renal dysfunction was the proximate cause of [Mr. Kittis's] injuries and death," and that further, "Dr. Brooks's report stated the inability to identify the cause of [Mr. Kittis's] bowel ischemia did not impact his conclusions." *Id.* at ¶ 27. Based on Kittis's arguments, the *Kittis I* panel recognized and concluded that

> Dr. Brooks testified that the three potential etiologies [causes] he would attribute to causing [Mr. Kittis's] bowel ischemia were torsion, a blood clot, or venous obstruction. Dr. Brooks *could not* testify within a reasonable degree of medical probability which etiology caused [Mr. Kittis's] ischemic bowel, *nor could he testify* with the necessary probability that if the Clinic looked for these problems during a second surgery that such a problem would have been found. However, it was not necessary for Dr. Brooks to proffer this additional medical testimony once he opined, to a reasonable degree of medical probability, that (1) the Clinic's failure to recognize in a timely fashion [Mr. Kittis's] progressive acidosis and renal dysfunction was the proximate cause for his eventual demise, and (2) [Mr. Kittis] had a surgically correctable problem had he undergone a second surgery on January 6, 2018.

(Emphasis added.)

*Id.* at ¶ 29. From that, the panel concluded that the Clinic's and the trial court's focus on the cause of the bowel ischemia was in error because the cause of the bowel ischemia was not relevant to the question posed on proximate cause, which was the Clinic's failure to initiate the surgery earlier in the day. *Id.* at ¶ 43. Thus, Kittis advanced a claim that the cause of the bowel ischemia was not relevant to her theory of the case, that a surgically correctable problem existed and the Clinic failed to timely diagnose it. According to Kittis, Dr. Brooks's inability to opine as to the cause of the bowel ischemia was not relevant, making the general cause of the bowel ischemia not relevant. *Id.* The panel accepted that argument and reversed the granting of summary judgment.

{¶ 9} At trial, Kittis maintained that same theory — that the Clinic failed to timely diagnosis a surgically repairable cause of the ischemia in the bowel, but with a renewed focus on the cause of the bowel ischemia, which Dr. Brooks initially believed to be caused by torsion (twisting of the intestine), a blood clot, or other venous obstruction, and that the delay in seeking a surgical correction led to the worsening condition leading to Mr. Kittis's death. Tr. 1006:24-1007:10; *but see Kittis I* at ¶ 43 (concluding that the trial court erred by focusing on the cause of the bowel ischemia). Unlike the opinions offered preceding summary judgment, Dr. Brooks stated that his trial opinions, as to the cause of the bowel ischemia, were to a reasonable degree of medical certainty. Despite rendering this opinion, Dr. Brooks contradicted his testimony, later ruling out two of the three causes during his direct examination.

{¶ 10} Kittis, through counsel, called Dr. Augustin to testify on cross-examination in her case in chief and questioned him about the ischemia noted in the medical records: "And they didn't write any qualification to this ischemia. They wanted to rule out a problem in the gastrointestinal area, and they were questioning a bowel perforation or hole in the bowel/or ischemia, correct?" Tr. 660:8-11. Dr. Augustin answered:

> I will read through that from my own lens as a surgical expert. I've been operating for 14 years at this point. What we found in the operating room, generalized small bowel ischemia, would not have shown up on a CAT scan, right? That's just -- so because you're trying to connect this to the operative report. What was found in the OR will be found in every patient who is hypotensive and on pressors. You will, if you operate on patients who are hypotensive and on pressors, they will always have small bowel ischemia. They are talking about a GI source, so ischemia in that sense is either related to a vascular issue, so you have, for example, a blood clot in the artery, a blood clot in the vein. Those issues will cause a significant abdominal examination. Those patients are not at all comfortable. So I think that this probable GI source ischemia within that context is what they're referring to. Not what I found in the operating room a day later.

Tr. 660:12-661:4.

{¶ 11} Despite the nonresponsive nature of the answer, Kittis's counsel expressly asked him on follow-up, after a few other questions: "Okay. Now, you just brought up something new, so I have to ask you about it. You just brought up that you think vasopressors had something to do with this picture here, right?" Tr. 661:17-21. Dr. Augustin unequivocally answered in part: "Vasopressors were used to *treat* shock[,]" a general condition brought on by decreased blood flow to the organs (hypoperfusion). (Emphasis added.) *Id.* That statement is supported by

the medical records Kittis obtained during discovery. Mr. Kittis was on vasopressors to treat hypoperfusion. Further, Dr. Augustin's nonresponsive answer aligned with his findings following the exploratory surgery, that the bowel was mildly ischemic, a condition not unexpected based on the hypoperfusion.

{¶ 12} Kittis used that line of questioning as a form of impeachment, suggesting that Dr. Augustin was varying his testimony in his defense at trial; for example, Kittis's counsel asked Dr. Augustin after discussing the vasopressors, "So you needed the experts to help you come in today to change your testimony from your deposition to be able to defend yourself here?" Tr. 750:3-5. Immediately after asking about the vasopressors, Kittis's counsel was prepared to, and did present, Dr. Augustin's various deposition statements as demonstrative evidence, going through the previous statements, line by line, to demonstrate his failure to mention vasopressors. Tr. 663.

{¶ 13} Following that exchange, Kittis's counsel also asked Dr. Augustin, "[D]id you call in any experts when you took care of Mr. Kittis to help you?" Tr. 749:11-12. In response, Dr. Augustin broached the topic of the mortality and morbidity conference, a peer-review procedure generally shielded by privilege. Upon request from Kittis's counsel, the trial court provided a curative instruction to disregard Dr. Augustin's unprompted reference.

{¶ 14} During Dr. Muntean's cross-examination in the plaintiff's case, Kittis's counsel attempted to impeach her by asking about her opinion on what caused Mr. Kittis's worsening condition. Tr. 818:1-2. During that exchange,

Dr. Muntean was told that "I do not care if you change your deposition testimony, okay" because "I want to know when you do it so I can tell [the jury] that one day under oath you told me one thing, and another day under oath you're going to tell them something different." Tr. 815:1-7. At her deposition, as one of the treating physicians, Dr. Muntean did not offer an opinion on the cause of Mr. Kittis's decline and ultimate death. Over the Clinic's objection to the line of questioning, Kittis's counsel was permitted to ask whether Dr. Muntean formed an opinion about causation that she did not provide during her discovery deposition. *Id.*

{¶ 15} Following those exchanges, during Dr. Brooks's testimony, Kittis's counsel cited Dr. Augustin's vasopressor testimony as a basis to expand the scope of Dr. Brooks's trial testimony to discuss hypoperfusion and the results of an echocardiogram taken post-surgery, neither of which were contained in his reports produced in discovery in violation of Civ.R. 26(E), and both of which addressed the Clinic's experts' previously disclosed opinions. His testimony was also the first time that an issue with Dr. Augustin's cross-examination testimony was articulated. The purpose of Dr. Brooks's disputed testimony was to suss out the cause of the bowel ischemia, an issue deemed not relevant and an improper focus as to the causation issue in *Kittis I* at ¶ 43. The Clinic's objection to Dr. Brooks's testimony was the subject of extended sidebar discussions.

{¶ 16} Dr. Brooks was permitted to testify about the echocardiogram to rebut Dr. Augustin's theory about global hypoperfusion, or the heart's inability to adequately send blood to the body's organs, despite not being a cardiologist or

otherwise qualified to opine on the subject matter. According to Kittis's counsel, the testimony regarding the hypoperfusion and related to the echocardiogram was "not an opinion as to the standard of care, [it is] not an opinion as to cause"; instead, it was "an explanation of the medical condition" that was already introduced through records at trial. Tr. 1018-1120. According to that argument, because those were "medical fact[s]" and not an opinion on causation or the standard of care, Dr. Brooks was not required to disclose that opinion in his pretrial report, and therefore, the testimony was admissible on the limited basis that Dr. Brooks did not render an ultimate opinion. Kittis's argument was similar to the one the Clinic made regarding Kittis's exploration of the vasopressors through Dr. Augustin's cross-examination. Tr. 1032:25-1033:2.

{¶ 17} Ultimately, the trial court permitted Dr. Brooks to testify about his reading of the echocardiogram as a medical fact but not offer his opinion interpreting the results — which aligned with the argument Kittis's counsel presented to the trial court in overruling the Clinic's objection. Thus, the limitations on Dr. Brooks's testimony were self-imposed. Despite the ruling, and Kittis's counsel's earlier declaration, Dr. Brooks was asked to interpret the meaning of echocardiogram as applied to Mr. Kittis: "And what does that [the echocardiogram results] tell us about whether or not the heart is perfusing adequately or supplying the body with adequate perfused blood to the organs? A. That means that it [Mr. Kittis's heart] was adequately perfusing various parts of the body." Tr. 1038:5-

9.  The Clinic did not object despite the testimony exceeding the scope of the trial court's ruling.

{¶ 18} Dr. Brooks also extensively discussed vasopressors and their impact on the body in further detail, which ensued without interruption.  Importantly, Dr. Brooks told the jury that the vasopressors administered would not reduce the blood flow to the bowels, countering Dr. Augustin's earlier testimony to the contrary. Tr. 1040-1041 (explaining to the jury that one of the vasopressors would not impact the bowel to any degree, and the other was only administered minutes before the exploratory surgery).  Again, that testimony focused on the cause of the bowel ischemia.  *But see Kittis I* at ¶ 43.

{¶ 19} The Clinic's expert, Dr. William Schirmer, maintained in both his expert report and trial deposition testimony that Mr. Kittis's preexisting heart condition caused global hypoperfusion, resulting in multisystem organ failure.  In other words, Dr. Schirmer agreed with the treating physicians' conclusions that an earlier surgery would have revealed nothing.  Because Dr. Schirmer's trial testimony was presented through recorded deposition testimony, he could not rebut Dr. Brooks's new testimony on the echocardiogram results.

{¶ 20} After extended discussions near the close of trial with respect to a motion to declare a mistrial based on Dr. Augustin's vasopressor testimony, the trial court offered the opportunity to recall Dr. Brooks to permit him to testify again on the vasopressor issue.  That request was declined by Kittis's counsel.

{¶ 21} In her closing remarks, Kittis reiterated that the Clinic breached the standard of care because the CT scan or exploratory surgery that the Clinic failed to timely perform would have revealed a surgically repairable condition, which when left unresolved caused Mr. Kittis's death. According to Kittis, the Clinic did not get Mr. Kittis to "the operating room fast enough, and as a consequence, all of his organs started to shut down."

{¶ 22} Ultimately, Kittis did not present any evidence that an earlier surgical intervention would have prevented or resolved the declining condition, and in particular Kittis maintained that the cause of the declining condition was the ischemic bowel. On that misplaced focus (*see Kittis I* at ¶ 43), Dr. Brooks conceded during his direct examination that there was no evidence of blood clot (concluding that the superior mesenteric artery was open) and no evidence of venous obstruction — two of the three theories he posited as causing the ischemic bowel, which according to him was surgically repairable. Tr. 1013:1-14; 1014:24. According to Dr. Brooks, "[W]e have no evidence of either of the other two processes [referencing the clot or venous obstruction] as the cause of the problem" and therefore the most likely cause was torsion. *Id.*

{¶ 23} The only evidence Dr. Brooks cited as demonstrating the necessity of earlier surgical intervention, however, was notations in the medical record indicating the treating medical providers' belief that torsion of the bowel could be causing the localized bowel ischemia. Tr. 1013:18-25. Notwithstanding, Dr. Brooks agreed during cross-examination that the post-exploratory surgery notations that

the bowel appeared "moderately dusky" indicated that surgical intervention was not possible. His conclusion was based on the lack of necrotic tissue (dead tissue) that would have been present had the decreased blood flow to the bowel been caused by a torsion. Tr. 1081:12-15. This aligned with his earlier statements that he could not "testify with the necessary probability that if the Clinic looked for these problems during a second surgery that such a problem would have been found." *Kittis I* at ¶ 29. Although Dr. Brooks also testified that he "believed" a partial torsion could cause ischemia in the bowel, tr. 1041, the Clinic's expert and Dr. Augustin both agreed that no surgically correctable condition was discovered in the exploratory surgery conducted.[1]

{¶ 24} After hearing the evidence, the jury rendered a verdict in favor of the Clinic, expressly concluding that Kittis failed to demonstrate that the Clinic breached the standard of care. This timely appeal followed.

{¶ 25} In this appeal, in two assignments of error, Kittis claims that Dr. Augustin's and Dr. Muntean's testimony constituted an impermissible trial by ambush because Dr. Augustin was extensively asked on cross-examination about his belief that mild bowel ischemia was an expected condition for patients who are administered vasopressors to treat hypoperfusion, the inadequate blood flow to all organs, and Dr. Muntean formed a new theory on causation not disclosed in her

---

[1] Dr. Brooks later conceded that he had not seen any reports in any medical literature discussing his theory of a partial torsion, and if that was occurring with Mr. Kittis, it would have been a "novel" event. Tr. 1102:10-13.

discovery deposition. Further, Kittis claims the trial court erred by "limiting" Dr. Brooks to testifying about his reading of the echocardiogram as it related to hypoperfusion as a medical fact, and not being able to render an opinion — which aligned with the argument Kittis's counsel presented to the trial court in overruling the Clinic's objection to Dr. Brooks's testimony.[2] To support that "trial by ambush" claim, Kittis cites *O'Connor v. Cleveland Clinic Found.*, 2005-Ohio-2328, ¶ 17 (8th Dist.), and *Cox v. MetroHealth Med. Ctr. Bd. of Trustees*, 2012-Ohio-2383 (8th Dist.), both of which reversed a trial verdict because a defendant offered a new causation theory at trial without first supplementing the discovery record.

{¶ 26} Neither *O'Connor* nor *Cox* are relevant based on the invited-error doctrine, and therefore, we need not delve into that line of authority. Although Kittis claims that Dr. Muntean's testimony regarding her new theory of causation was impermissible, Kittis's counsel asked the question of Dr. Muntean over the Clinic's objection. Tr. 814. Further, the trial court's initial limitation on Dr. Brooks's testimony regarding hypoperfusion and the echocardiogram, as it related to the vasopressor question, was at Kittis's counsel's request: the argument against the Clinic's objection was based on Dr. Brooks's testimony not being considered an

---

[2] In this appeal, Kittis also claims "the trial court's decision to bar Dr. Brooks from testifying about general medical facts—like background facts on lactate levels and Dennis' echocardiogram—was arbitrary." That statement is not supported by any citation to the record, and from our review of the trial transcript, it is clear the trial court, over the Clinic's objection, permitted Dr. Brooks to testify about the general medical facts regarding the lactate levels and the echocardiogram, the latter of which was expressly at Kittis's counsel's request. Tr. 998; 1038.

opinion on causation or the standard of care, and therefore, the testimony was limited to the medical facts. It is axiomatic that a party cannot base any appellate error on their chosen trial tactics.

{¶ 27} Thus, the only potential error upon which a new trial could be based in this case stems directly from the testimony by Dr. Augustin, testimony elicited by Kittis on cross-examination in her case-in-chief. The issue in this appeal relates to the admissibility of evidence, not a general claim for mistrial or a discovery violation caused by a defendant's offering a new causation theory at trial.

{¶ 28} "'One of the purposes of the Rules of Civil Procedure is to eliminate surprise.'" *O'Connor*, 2005-Ohio-2328, at ¶ 17 (8th Dist.), quoting *Jones v. Murphy,* 12 Ohio St.3d 84, 86 (1984). If a discovery violation under Civ.R. 26(E) occurs through the defendant's conduct, the remedy is to exclude the evidence at trial. *See, e.g., Vaught v. Cleveland Clinic Found.*, 2003-Ohio-2181, ¶ 28 (trial court correctly excluded expert testimony based on the Civ.R. 26(E) violation); *Beard v. St. Vincent Charity Hosp.*, 2017-Ohio-7608, ¶ 10 (8th Dist.). That was a ruling Kittis never sought until attempting to use Dr. Augustin's vasopressor testimony to expand the scope of Dr. Brooks's testimony.

{¶ 29} Notwithstanding, because the question raised is one of admissibility of certain evidence, plain error and forfeiture must be considered as it relates to the initial testimony from Dr. Augustin relating the vasopressors to the bowel ischemia. *See* Evid.R. 103(A)(1) and (D). In general, "Evid.R. 103(A)(1) requires that a party timely object when allegedly inadmissible evidence is introduced at trial.

A timely objection is, typically, one made at the time the error complained of occurred." *Hyams v. Cleveland Clinic Found.*, 2012-Ohio-3945, ¶ 17 (8th Dist.). But in addition to that, on the evidentiary question, Kittis invited any potential error by asking numerous follow-up questions exploring the vasopressor's impact on the bowel after failing to seek a curative instruction after Dr. Augustin mentioned the vasopressors in the nonresponsive answer to a question posed on cross-examination. The invited-error doctrine establishes that a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co. Lincoln-Mercury Div.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus.

{¶ 30} The Clinic did not elicit Dr. Augustin's vasopressor testimony, nor did Kittis object when Dr. Augustin referenced the vasopressors. Further, that testimony, regarding the cause of the ischemic bowel, was irrelevant to the question left for trial according to *Kittis I* at ¶ 43.

{¶ 31} Nevertheless, instead of objecting and seeking a limiting instruction, as Kittis had requested after Dr. Augustin broached the topic of the peer-review conference, Kittis asked Dr. Augustin to go into depth and detail on why he off-handedly mentioned vasopressors in answering a general question. Tr. 660:8-21. Kittis expressly asked him on follow-up: "Okay. Now, you just brought up something new, so I have to ask you about it. You just brought up that you think vasopressors had something to do with this picture here, right?" Tr. 661:17-21. Dr. Augustin unequivocally answered in part: "Vasopressors were used to *treat*

shock." (Emphasis added.) *Id.* That statement is supported by the medical records Kittis obtained during discovery and supported by Dr. Augustin's opinion that Mr. Kittis suffered from hypoperfusion, which is the decreased blood flow to all organs. Mr. Kittis was on vasopressors to treat the general condition he was experiencing. Kittis, however, did not stop with a single question but probed deeper, eliciting a further discussion on vasopressors and their impact of decreasing the blood flow to the bowel, a condition that everyone agrees existed to some degree. Any error in Dr. Augustin's mention of vasopressors was then forfeited.

{¶ 32} In fact, his testimony was used in an attempt to impeach Dr. Augustin at trial, and to expand the scope of Kittis's expert's trial testimony to include topics beyond his area of expertise and the scope of his pretrial disclosures, which would have been in violation of Civ.R. 26(E). In addition, Dr. Brooks fully testified as to his belief about vasopressors not causing bowel ischemia to rebut Dr. Augustin's beliefs. Any error in delving into the vasopressor issue was instigated by Kittis, and any error in Dr. Augustin's initial mention of vasopressors as a cause of the ischemic bowel was forfeited by Kittis in failing to object and seek a curative instruction. For this reason, the first two assignments of error are overruled.

{¶ 33} But even if not invited or forfeited error, the vasopressor testimony was not relevant to Kittis's trial theory, such that any presumed error would be harmless. *See* Civ.R. 61. The sole issue for trial regarding the standard of care was whether the bowel ischemia, regardless of the cause of it, was surgically correctable, which according to Kittis, would have prevented Mr. Kittis's declining

condition that led to his death. *See, e.g., Kittis I* at ¶ 28 ("Dr. Brooks also opined that Mr. Kittis had a surgically correctable problem causing his bowel ischemia, and if the Clinic had initiated the second surgery on January 6, 2018, it would have discovered the problem, and Mr. Kittis could have been salvaged."); *but see id.* at ¶ 29 ("Dr. Brooks could not testify within a reasonable degree of medical probability . . . that if the Clinic looked for these problems during a second surgery that such a problem would have been found."). The cause of the bowel ischemia was not relevant to that standard of care or the breach. *Id.* In fact, the *Kittis I* panel chastised the trial court for focusing on the cause of the bowel ischemia and Dr. Brooks's then lack of an opinion as to the cause. *Id.* at ¶ 43.

{¶ 34} In simplistic terms, Kittis's trial theory was that Clinic failed to timely diagnosis a surgically correctable condition in the bowel, believed to be caused by torsion (twisting of the intestine), a blood clot, or other venous obstruction, and that the delay in seeking a surgical correction led to the worsening shock condition. *Id.* at ¶ 8 (noting that "Dr. Brooks stated to a reasonable degree of medical probability that Mr. Kittis had a surgically correctable problem on January 6, 2018, if the Clinic had completed a second surgery on that day"). Even if that focus was misplaced based on *Kittis I* at ¶ 43, at trial, Dr. Brooks ruled out the blood clot or venous obstruction, leaving only the bowel torsion as a possibility. On that question, however, Dr. Brooks agreed that the post-exploratory surgery notations that the bowel appeared "moderately dusky" would indicate that earlier surgical intervention to prevent the ischemic bowel was not possible, and he agreed that no evidence of

torsion was discovered in the exploratory surgery conducted. Thus, the determination of whether a surgically repairable condition existed was well within the province of the jury to resolve; it came down to competing testimony by both parties.

{¶ 35} Mr. Kittis's death is tragic and arose from an unfortunate situation, but not all such outcomes necessarily imply the existence of medical malpractice. Kittis was unable to present to the jury any evidence that a surgically repairable condition existed that would have been discovered earlier than when the exploratory surgery was conducted, which was the sole issue remaining following *Kittis I*. Even if we presumed the existence of error and disregarded the invited-error doctrine, any such error would be harmless because it did not impact a substantial right. Kittis was able to rebut the vasopressor evidence through her expert, who testified to subject matters not contained within his expert report and outside of his area of expertise on that topic to rebut Dr. Augustin's vasopressor testimony.

{¶ 36} The jury's verdict is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, PRESIDING JUDGE

DEENA R. CALABRESE, J., CONCURS;
KATHLEEN ANN KEOUGH, J., DISSENTS (WITH SEPARATE OPINION)


KATHLEEN ANN KEOUGH, J., DISSENTING:

{¶ 37} I respectfully dissent from the majority and would have reversed and remanded this matter for a new trial, finding that the Clinic violated Civ.R. 26(E), ultimately causing a domino effect that subjected Kittis to an unfair trial. The majority's reliance on this court's prior summary judgment ruling ignores the fact that the jury heard prejudicial information during trial, ultimately spoiling the trial's fairness. I will also take this opportunity to address the recent relaxation of the discovery rules to the detriment of ensuring a fair trial.

{¶ 38} "The purpose of the discovery rules is to 'prevent surprise and the secreting of evidence favorable to one party' in order to 'produce a fair trial.'" *In re E.S.*, 2020-Ohio-3598, ¶ 25 (8th Dist.), quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987). The duty to supplement expert testimony is necessary because preparation for effective cross-examination is particularly compelling when it involves expert testimony. *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 370 (1986).

**{¶ 39}** Civ.R. 59(A) provides that a new trial "may be granted" when there is "[i]rregularity in the proceedings of the court . . . or prevailing party, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial" and/or "[m]isconduct of the . . . prevailing party[.]" Civ.R. 59(A)(1) and (2). While this appeal is premised on the granting of a mistrial, Civ.R. 59(A) provides grounds for a new trial that I believe are both implicated herein.

**{¶ 40}** Throughout the pendency of this matter, Kittis and the Clinic maintained competing theories regarding Mr. Kittis's case. Dr. David Brooks, Kittis's expert, testified as to his theory of the case. Dr. Brooks opined that the Clinic deviated from the standard of care in failing to perform an exploratory laparotomy at an earlier time based on Mr. Kittis's condition.

**{¶ 41}** On the Clinic's side, Dr. Augustin, the treating doctor, changed his theory between his August 3, 2021, deposition and February 2025 trial. When asked during his deposition "[w]hat was the likely cause of the ischemia?" Dr. Augustin responded that it was "global hypoperfusion." (Augustin Dep. tr. 21.) When questioned why "hypoperfusion" does not appear within his operative note, Dr. Augustin explained that of the "hundreds" of cases of bowel obstructions he had treated, "not one person in recent memory [] had a clinical course like [Mr. Kittis]'s[.]" (Augustin Dep. tr. 27.) When, at his deposition, he was asked whether there were any other causes of Mr. Kittis's ischemia, Dr. Augustin responded that "[g]lobal hypoperfusion was all that I can tell." (Augustin Dep. tr. 21.) When asked if he knew the "mechanism of that global hypoperfusion," he responded:

I just don't know. I don't know. All I can tell you is that every possible reversible cause was worked up to the greatest depth possible. He did not have a reversible cause.

He did not have sepsis. He did not have a bowel perforation. He did not have hemorrhage. He did not have a cardiac event. He did not have a stroke. He did not have a urinary tract infection. He did not have pneumonia. He did not have DVTs. He had no reversible causes. That's your top 20 causes.

(Augustin Dep. tr. 26-28.)

{¶ 42} Dr. Augustin's deposition transcript does not contain any testimony about vasopressors and their effect on Mr. Kittis's ischemic condition or global hypoperfusion. His testimony during the 2025 trial, however, centered on the role of the vasopressors and their contribution to Mr. Kittis's ischemia. During trial, Kittis asked Dr. Augustin on cross-examination about the cancelled CT scans and whether the CT scans were originally ordered for suspected bowel ischemia. His response was, "What I found in the OR [operating room] is medical ischemia related to shock, related to two vasopressors. He was on two vasopressors at the time." (Feb. 26, 2025 tr. 659.) Dr. Augustin linked the vasopressors to Mr. Kittis's ischemia and hypoperfusion at least three more times during his cross-examination.

"Patients who are hypotensive and on pressors, they will always have small bowel ischemia. You will, if you operate on patients who are hypotensive and on pressors, they will always have small bowel ischemia." (Feb. 26, 2025 tr. 660-61.)

"We're talking about a patient who is hypotensive and in shock on vasopressors." (Feb. 26, 2025 tr. 721.)

"That does not take away from the fact that a patient in shock on two pressors will have ischemia everywhere." (Feb. 26, 2025 tr. 739.)

{¶ 43} It is undisputed that Dr. Augustin did not mention vasopressors or identify vasopressors as a cause of Mr. Kittis's ischemia or global hypoperfusion in his deposition or at any time prior to trial and in fact testified to the contrary: he was unable to determine the factor or factors contributing to Mr. Kittis's condition. The Clinic's counsel acknowledged this deviation from the deposition testimony on numerous occasions:

> [KITTIS'S COUNSEL]: I think [the Clinic's counsel] will agree that Dr. Augustin offered new opinions yesterday. He even said, Your Honor, it was based on reading my expert's opinions.
>
> [THE CLINIC'S COUNSEL]: So he did talk about many of the same things that he said in deposition, but there were — there was a comment about vasopressors.

(Feb. 26, 2025 tr. 751-752.)

> [KITTIS'S COUNSEL]: Where were vasopressors in his depo?
>
> [THE CLINIC'S COUNSEL]: He did not say vasopressors specifically in his depo.
>
> . . .
>
> [THE CLINIC'S COUNSEL]: Sorry. That was not something that I anticipated he was going to bring up. I didn't know he was going to bring it up. It was on cross-examination.

(Feb. 26, 2025 tr. 1031.)

> THE COURT: Do you concede what she just said, this connection between vasopressors and the ischemia was brought up for the first time in trial?
>
> [THE CLINIC'S COUNSEL]: So the vasopressors, first time he said it was in trial.

(Feb 26, 2025 tr. 1033.)

[THE CLINIC'S COUNSEL]: Nothing about the vasopressors was presented by me. It came out on their cross.

[KITTIS'S COUNSEL]: That is a lie . . . You're telling this judge on the record that you had no idea that your doctor, if asked on cross-examination, would offer a new theory?

[THE CLINIC'S COUNSEL]: I did not.

[KITTIS'S COUNSEL]: He surprised you too?

[THE CLINIC'S COUNSEL]: [Kittis's Counsel], did we not go into the M&M? He surprised me several times.

[KITTIS'S COUNSEL]: But did he surprise you on vasopressors?

[THE CLINIC'S COUNSEL]: Yes.

(Feb. 26, 2025 tr. 1035-1036.)

{¶ 44} In response to Dr. Augustin's new testimony adding vasopressors as a variable that caused Mr. Kittis's ischemia, Kittis cross-examined him about this change. Dr. Augustin admitted that during his deposition, he testified that Mr. Kittis passed away from "unknown" shock. He explained, however, that since that time, "[W]e now know that the cause of his shock . . . was related to a [systemic inflammatory response syndrome] related to global hypoperfusion, which . . . caused third spacing of all of his fluids." (Feb. 26, 2025 tr. 744.) He explained that Mr. Kittis passed from a specific type of shock – "hypovolemic shock" related to "the resuscitation not getting to and staying inside his blood vessels." (Feb. 26, 2025 tr. 747.) He further testified that "[s]ince [his deposition] . . . I have reviewed his chart extensively . . . with a lot more depth than I have ever reviewed . . . a chart." (Feb. 26, 2025 tr. 748.)

{¶ 45} At his deposition, Dr. Augustin was asked whether he "published [Mr. Kittis]'s clinical case as the unique case study that it is so that others can learn about it, study it and perhaps make roadway into treating this unique and rare condition?" (Augustin Dep. tr. 31.) Dr. Augustin responded with "No." *id.* At trial, approximately four years later, his answer to this question differed:

> [KITTIS'S COUNSEL]: Now, given that he stumped you, given that this case was so rare and so unusual, I take it you educated the medical community and published an article about this extraordinary case so that you could educate other physicians in training about this phenomenon?
>
> [DR. AUGUSTIN]: Yeah, I think you asked me that question in my depo, and I think that it is – it's my job to educate residents. It's my job to educate folks who might not have seen this situation. But typically when we do that, we base it off of objective findings.
>
> In this case, there was no autopsy. I couldn't — you know, it's difficult to take hypotheticals, put it into a report that the rest of the world reads without really, you know, having the evidence from objective testing.
>
> So I did not think it was to the point where I would have written about it. And I write a lot, as you know from my CV, you know, I've published a lot. But this case per se did not — now having said that, you know, we do talk about every mortality, every complication that we have at our surgical mortality and morbidity conference. And as I've said, there's 15 surgeons, 30, 40 trainees in the room, there's a lot of people. So we do educate short of writing a paper, so that did happen.

(Feb. 26, 2025 tr. 751-752.)

{¶ 46} Immediately after this surprising testimony, Kittis's counsel called a sidebar and noted that Dr. Augustin had opened the door to morbidity and mortality ("M&M") conferences concerning this patient that he referenced to bolster his testimony. In response, the Clinic's counsel argued that Dr. Augustin did not specify whether he brought this specific case to an M&M conference and that Kittis invited

the testimony by asking Dr. Augustin whether he had published any articles — not presenting this at a conference. Kittis accordingly requested (1) receipt of the M&M file or (2) a ruling that the testimony about the conference be stricken from the record. It was at this point that Kittis's counsel alluded to the impropriety of the M&M conference testimony and suggested that it was grounds for granting a mistrial. The trial court ultimately advised the jury to disregard the information about the M&M conference.

{¶ 47} Kittis renewed her objection to the trial court giving a curative instruction to the jury rather than granting Kittis's request, and the trial court advised the jury as follows:

> Okay. So, ladies and gentlemen of the jury, there was some discussion about what the doctor did in educating his peers after the fact. There's something that's called a mortality and morbidity conference. Sometimes you get instructions from the judge in the middle of trial. So these things are privileged and confidential. What I am going to tell you is that there is, I'm going to explain to you as a matter of law, so to speak, which translates into facts which you are not allowed to consider in your deliberation. Seems kind of weird, I'm asking you to unring a bell a little bit. But it's a point that I want to make that you are not to accept as fact or not fact, so that it did or did not exists, that this was ever presented at what they call an M&M conference, mortality and morbidity conference. . . .There's no evidence one way or the other that this was ever discussed at a morbidity and – M&M conference, and you are to erase that from your minds and we're not going to be asking any questions or answering, or it's not going to be included in any answers. I'm instructing the witness not to include it in any of his answers. Does that make sense to everybody? Anybody have any questions about that instruction?
>
> Okay. So there's no evidence one way or the other whether or not this was brought into an M&M conference.

(Feb. 26, 2025 tr. 767-768).

{¶ 48} Dr. Brooks testified as to his theory of the case, opining that the Clinic deviated from the standard of care in untimely performing an exploratory laparotomy or taking CT scans, either of which would have revealed Kittis's ischemia.

{¶ 49} On direct examination, Dr. Brooks was asked to address Dr. Augustin's testimony and references to vasopressors. Specifically, Kittis asked him to explain the medically significant differentiation between the lactate levels in the venous system versus the arterial system. The Clinic's counsel objected and argued that this difference was not addressed prior to trial in deposition or in Dr. Brooks's expert report. A lengthy sidebar ensued wherein the court attempted to understand how the difference between these levels related to Dr. Brooks's "ultimate opinion" regarding standard of care and causation.

{¶ 50} After the sidebar concluded, the trial court reminded every party to remain consistent with what information had been provided before trial, either in the expert reports or at deposition. Kittis's counsel expressed discontent with this ruling, arguing in response that "Dr. Augustin got on that stand and Dr. Augustin offered all sorts of new opinions . . . He offered all sorts of information . . . that he had never offered before. And now our expert is not [allowed to respond] because, not surprisingly, he relied on Dr. Augustin's deposition." (Feb. 26, 2025 tr. 979-980.) Ultimately, the trial court ordered Dr. Brooks to "continue on with exactly what his opinions were before, what everybody's been saying up to this point[.]" (Feb. 26, 2025 tr. 994.) In other words, he was precluded from testifying about

anything beyond the contents of his expert report, including offering an opinion on Dr. Augustin's previously undisclosed testimony.

{¶ 51} The issue arose once again the following day, while Kittis's direct examination of Dr. Brooks continued. While Kittis was questioning Dr. Brooks about Mr. Kittis's heart symptomology and condition, the Clinic objected. At sidebar, the Clinic again argued that the question asked was outside of the scope of Dr. Brooks's expert report and had not been disclosed prior to trial. Following this discussion, the court allowed Kittis to question Dr. Brooks about vasopressors generally, but precluded Dr. Brooks from giving an "ultimate opinion" as to the vasopressors causing ischemia, as opined by Dr. Augustin during trial. (Feb. 26, 2025 tr. 1036.) Brief questioning about vasopressors ensued without interruption, but later in trial, Kittis complained and maintains now on appeal that because of the trial court's ruling, she was not able to elicit the ultimate opinion testimony from Dr. Brooks to properly rebut the new vasopressor theory.

{¶ 52} The Clinic's expert, Dr. William Schirmer, maintained in both his expert report and prerecorded trial testimony that Mr. Kittis's preexisting heart condition caused global hypoperfusion, resulting in multisystem organ failure. In his prerecorded testimony, Dr. Schirmer did not discuss vasopressors as a cause of Mr. Kittis's ischemia, which also could have caused the global hypoperfusion according to Dr. Brooks's testimony, and did not testify about them in any form. Because it was prerecorded, however, Kittis was unable to cross-examine Dr. Schirmer about the role of the vasopressors.

{¶ 53} At the close of her case, Kittis moved for a mistrial, arguing that the Clinic violated Civ.R. 26(E) and did not supplement discovery, including Dr. Augustin's deposition testimony, with the previously undisclosed information about vasopressors causing ischemia. Second, she argued that the court's various rulings collectively barred her from rebutting or impeaching the vasopressor theory. According to Kittis, these rulings collectively prevented her expert from addressing the ultimate issues relating to the vasopressors.

{¶ 54} In response, the Clinic contended that Dr. Brooks testified about vasopressors anyway, despite the trial court's admonition to keep testimony within the scope of the discovery. The Clinic argued that Dr. Brooks "testified that those vasopressors would not essentially have caused hypoperfusion. So I did not object. There was a ruling at sidebar, but that testimony came in." (Feb. 26, 2025 tr. 1215.) The Clinic's counsel did, however, admit that "from my perspective it was unfortunate that [Dr. Augustin] mentioned vasopressors, but at the same time I forgo[ed] the cross-examination of Dr. Brooks on that point because he was wrong[.]" (Feb. 26, 2025 tr. 1216.) Kittis's counsel maintained that she was unable to develop the full scope of Dr. Brooks's testimony that vasopressors caused Mr. Kittis's ischemia because of the court's ruling. The Clinic also suggested that vasopressors were in the record the entire time and that all experts looked at those records in forming their opinions.

{¶ 55} The trial court denied the mistrial, giving multiple reasons for doing so but relevantly explained that it felt that Kittis ignored the ruling and elicited

opinion testimony from Dr. Brooks anyway — stating, "[I]f you didn't go past what I said, maybe I would have granted [the mistrial]." (Feb. 26, 2025 tr. 1221.) The trial court also agreed with the Clinic's argument that the vasopressors were not "new" opinions because the vasopressor variable did not change the Clinic's theory of the case. The trial court explained that both parties were given a fair opportunity to rebut each side's theory of the case.

{¶ 56} Along with denying the mistrial, the trial court offered that Dr. Brooks could return and continue testifying, whether in person or over Zoom. Regardless, the trial court felt that Kittis ignored the trial court's ruling because her counsel elicited testimony from Dr. Brooks that went beyond the scope of his expert report and deposition. When Kittis expressed concerns with how bringing Dr. Brooks back would appear to the jury, the trial court stated, "I've done this before. I'll take responsibility. I made a ruling, I rereviewed it. I'm incorrect in my ruling — I don't mind taking responsibility for any of that in front of the jury." (Feb. 26, 2025 tr. 1227.) It added, "I had time to rereview one of the objections, I changed my mind, and so we're going to bring back Dr. Brooks for a couple questions. I have no problem doing that." (Feb. 26, 2025 tr. 1227.)

{¶ 57} The next day, the trial court again offered that Dr. Brooks could return to testify, but Kittis's counsel responded:

> It's not something — one, it's not something we want, but two, it's not something we can, you know, logistically we can pull off the way we would want. I appreciate it. As it pertains to, it's hard to unring the bell, so, you know what I mean, because it's out there. So we think the evidence is what it is . . . I don't think it fixes it. For him not to argue it

in a point where you're going to tell the jury it's not evidence doesn't change the evidence, and I don't think we can be limited from addressing the evidence.

(Feb. 26, 2025 tr. 1266.)

{¶ 58} As the majority stated, when trial concluded, the jury returned a verdict in favor of the Clinic, finding that the Clinic did not violate the requisite standard of care. I believe that this verdict originated from an objectively unfair trial and should be vacated.

{¶ 59} The chain of events giving rise to the unfair trial began with the Clinic's Civ.R. 26(E) violation. Civ.R. 26(E)(1) and (2) provide that "[a] party is under a duty seasonably to supplement discovery responses with respect to any question directly addressed to . . . the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify." "This duty to supplement responses on the subject matter of expert testimony is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." *Shumaker*, 28 Ohio St.3d at 370 (1986). This has been interpreted to include deposition testimony, not just interrogatory responses. *O'Connor*, 2005-Ohio-2328, ¶ 17 (8th Dist.). *See also Walker v. Holland*, 117 Ohio App.3d 775, 783 (2d Dist. 1997). "'One of the purposes of the Rules of Civil Procedure is to eliminate surprise.'" *Id.,* quoting *Jones*, 12 Ohio St. 3d 84 at 86 (1984). Further, Civ.R. 26(E) is "to provide opposing counsel with updated and complete discovery regarding the substance of expert testimony." *Id.* And, "[t]his duty to supplement responses on the subject matter of

expert testimony is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." *Id.*, citing *Smith v. Ford Motor Co.*, 626 F.2d 784 (10th Cir. 1980); *Scott & Fetzer Co. v. Dile*, 643 F.2d 670 (9th Cir. 1981). Civ.R. 26(E) "imposes a continuing duty to update [expert reports] should the expected scope or opinion of the expert testimony change." *Peffer v. Cleveland Clinic Found.*, 2011-Ohio-450, ¶ 30 (8th Dist.), citing *Vaught*, 2003-Ohio-2181, ¶ 14-21. Kittis argues that Dr. Augustin's newfound reliance on vasopressors in contributing to Mr. Kittis's bowel ischemia was never supplemented or provided to Kittis before trial. Kittis thus argues that this failure to supplement violated Civ.R. 26(E). I agree.

{¶ 60} Before trial, Dr. Augustin had not relied on vasopressors as one of the causes of Mr. Kittis's ischemia. This is largely undisputed as indicated by the transcript. At trial, Dr. Augustin mentioned the role of the vasopressors in causing ischemia four times, and he acknowledged that he did not discuss vasopressors prior to trial. Dr. Augustin's numerous references to vasopressors suggest that vasopressors are relevant to Mr. Kittis's symptomology and condition and should have informed his medical decision-making. The Clinic's counsel likewise conceded on several occasions that the vasopressor testimony was "new" and had not been discussed at deposition nor supplemented. But the testimony and role of vasopressors was not unknown to the Clinic's counsel. The Clinic's opening statement specifically described vasopressors and their precarious use because of the many interactions and side effects caused by the drugs.

{¶ 61} In *O'Connor*, this court reversed a jury verdict in favor of the defendant, ordering a new trial because at the treating doctor's deposition, the doctor could not answer "why the injury was not discovered during the operation." 2005-Ohio-2328, ¶ 16 (8th Dist.). When asked the same question at trial, he acknowledged that it was "more likely than not that he caused the [injury], and offered an opinion that the [injury] was . . . not immediately detectable." *Id.* at ¶ 9. Noting that "[a]ppellants were surprised and prejudiced by the new theory advanced by" the treating doctor, this court found that the Clinic violated Civ.R. 26(E) by failing to supplement discovery with the previously undisclosed causation theory prior to trial and reversed the jury's defense verdict for a new trial, citing unfair surprise. *Id.*

{¶ 62} Similarly, in *Cox*, 2012-Ohio-2383 (8th Dist.), this court found a violation of Civ.R. 26(E) and reversed for a new trial where a jury heard an expert's previously undisclosed trial testimony and because of the procedural posture in *Cox*, the plaintiffs were unable to cross-examine and impeach this expert witness. The *Cox* Court held that because the plaintiff was "unfairly surprised" by the information revealed during trial, he could not adequately prepare a cross-examination. *Id.* at ¶ 39. This decision was based on the "constitutional right to present rebuttal testimony on matters that are raised for the first time in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief." *Id.* at ¶ 32, citing *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410 (1994). *Cox* found an abuse of

discretion because the issue "[went] to the heart of the claim," which was ultimately prejudicial to the plaintiff.  *Id.* at ¶ 43.

{¶ 63} I acknowledge that *O'Connor* and *Cox* both found that the trial court erred in allowing the jury to hear impermissible testimony that it should not have heard, which is distinguishable in substance from the case herein.  In this case, the jury heard previously undisclosed and impermissible testimony, but the trial court's rulings and the circumstances of the case, i.e., that Dr. Schirmer's testimony was prerecorded and he could not be adequately cross-examined, forbade Kittis from eliciting rebuttal testimony from her own expert, resulting in an unbalanced ruling. As stated in *O'Connor*, failure to disclose the new theory "distorted the level playing field."  *Id.* at ¶ 49.  Likewise, here, our analysis is premised on the same fairness concepts — allowing the jury to hear undisclosed information without an opportunity to address that information is prejudicial and distorts the level playing field.  The same considerations about "unfair surprise" and "trial by ambush" underpin the procedure that occurred in this case.

{¶ 64} I would therefore find, consistent with *O'Connor* and *Cox*, that the Clinic violated Civ.R. 26(E) in failing to disclose Dr. Augustin's new theory regarding the role of vasopressors in Mr. Kittis's treatment — an issue that goes to the "heart of the claim," as was the undisclosed information in *Cox*. The Clinic did not supplement discovery after Dr. Augustin's deposition or after Dr. Augustin presented the case to the M&M conference.  These violations effectively ambushed Kittis and were further exacerbated by the trial court when it forbade her from

eliciting rebuttal testimony from Dr. Brooks. As stated in *Cox*, "Fundamental principles of fairness dictate that each party be given the opportunity to present their case on the merits." *Cox*, 2012-Ohio-2383 at ¶ 35 (8th Dist.).

{¶ 65} In my view, the Clinic's Civ.R. 26(E) violation started a chain of events that ultimately caused the trial court to abuse its discretion by barring Kittis from fully and completely rebutting the previously undisclosed testimony. The trial court itself acknowledged this error and offered to bring Dr. Brooks back to testify. Here, Kittis could not cross-examine Dr. Schirmer because his testimony was pre-recorded, leaving her only Dr. Brooks to rebut this testimony — which was then impeded by the court's rulings.

{¶ 66} While the Clinic's Civ.R. 26(E) violations by themselves may not be grounds for a mistrial, the violations coupled with the trial court's evidentiary rulings and the posture of specific witnesses such as Dr. Shirmer and Dr. Brooks combined to create an unfair trial. Likewise, the M&M conference testimony in and of itself does not constitute an abuse of discretion because of the limiting instruction given. *State v. Garner*, 74 Ohio St.3d 49, 59 (1995) ("A jury is presumed to follow the instructions, including curative instructions given by a trial judge."). This presumption is overcome, however, when it is shown that the evidence could not have been ignored and that serious prejudice likely occurred. *State v. Westwood*, 2002-Ohio-2445, ¶ 42 (4th Dist.) (collecting cases). In my opinion, serious prejudice occurred in totality, especially given the implications of the M&M conference, suggesting that a group of doctors from the conference essentially

informed Dr. Augustin's "new" theory. I would find that the Civ.R. 26(E) violation, the M&M conference testimony, Dr. Augustin's vasopressor testimony, Kittis's inability to cross-examine Dr. Schirmer, and the trial court's rulings combine to collectively prejudice Kittis.

{¶ 67} Accordingly, I would have found that this case presents a unique situation where the cumulative effect of the errors created an unfair trial, and the mistrial motion should have been granted.

{¶ 68} I also take this opportunity to emphasize that Civ.R. 1(B) provides that the Civil Rules "*shall* be construed and applied to effect just results[.]" (Emphasis added.) The very purpose of the Civil Rules is to foster predictability and prevent unfair trials. When these rules are relaxed or violated, it is the trial court's duty to ensure that fairness is restored and balanced. Indeed, "the existence and effect of prejudice resulting from noncompliance with the [Civil Rules] is of primary concern, not just the intent or motive involved." *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 85 (1985). Even if a discovery failure is "produced by neglect, a change in defense strategy or an inadvertent error," such as here concerning Dr. Augustin's testimony about the M&M conference and vasopressor theory, it is still necessary to examine the resulting prejudice and fashion an adequate remedy. *Id.*

{¶ 69} There have been a concerning number of cases where Civ.R. 26 violations affecting fairness are excused and regarded as harmless. These decisions go against the trial court's "responsibility to ensure that there [is] no unfair prejudice

or surprise[.]" *Vaught*, 2003-Ohio-2181, ¶ 27. As indicated by the forthcoming examples, the relaxed enforcement of Civ.R. 26 permeates numerous Ohio courts.

{¶ 70} At the forefront, this court recently dismissed a matter for rehearing en banc, finding that it was improvidently granted. In *Gerace*, defendant the Clinic did not provide a privilege log to the court as required by Civ.R. 26. *Gerace v. Cleveland Clinic Found.*, 2024-Ohio-2708 (8th Dist.), *jurisdiction declined*, *01/06/2026 Case Announcements*, 2026-Ohio-13. This court reasoned that "we are asked to answer an inapplicable en banc question because the Cleveland Clinic did not follow the mandates of Civ.R. 26 to even allow the trial court to determine whether an in camera inspection or evidentiary hearing is necessary." Journal Entry 9/3/2025, Motion No. 587286, Keough, J., concurring. A similar, potential Civ.R. 26 violation was deemed harmless after determining that it was not prejudicial in *Talani v. Manorcare, Inc.*, 2013-Ohio-4295 (11th Dist.). In my view, generally withholding any evidence that *shall* be produced under Civ.R. 26 is prejudicial in and of itself.

{¶ 71} In *Branch v. Cleveland Clinic Found.*, 2012-Ohio-5345, the Ohio Supreme Court found that the trial court did not abuse its discretion when faced with a Civ.R. 26 violation. In *Branch*, the Clinic, at trial, used a demonstrative exhibit that recreated the at-issue surgery. Plaintiff's counsel had not been afforded the opportunity to review this demonstrative exhibit until ten minutes prior to the Clinic's expert's testimony. While this is a Civ.R. 26 violation and the demonstrative evidence was considered "important," the Ohio Supreme Court deferred to the trial

judge's decision to not exclude the demonstrative exhibit, reasoning that "we defer to the trial court's judgment that [Plaintiff's counsel] had adequate opportunity to cross-examine clinic doctors with respect to the exhibit despite the minimal notice." *Id.* at ¶ 18.

{¶ 72} In *Beard v. St. Vincent Charity Hosp.*, 2017-Ohio-7608, ¶ 7 (8th Dist.), this court did not find that it was an abuse of discretion when the trial court allowed an expert to testify about a CT scan that was not reviewed in the expert's initial report. In finding no abuse of discretion, this court concluded that because there was no unfair surprise or willful noncompliance with the rule, such testimony was not prejudicial. The *Beard* Court also deemed the testimony nonprejudicial because plaintiffs were able to cross-examine the expert. Once again, even if a party cross-examines a witness after surprise testimony does not excuse the fact that the subject of the cross-examination was improperly undisclosed prior to trial.

{¶ 73} In *Rush v. Univ. of Cincinnati Physicians*, 2016-Ohio-947, ¶ 18 (1st Dist.), the First District found no error where two experts identified rib fractures in an MRI for the first time at trial. The rib fractures were not identified prior to trial in either the expert's report or deposition testimony. On appeal, the First District acknowledged that the rib fractures were not identified prior to trial but found no error because it was not a new theory of causation nor did it constitute "new" testimony. While these statements are true, the court did not consider the effect of the surprise on the fairness of trial — the paramount concern in enforcing discovery rules.

{¶ 74} Most of the aforementioned cases share a similar underlying conclusion: that Civ.R. 26(E) violations are excusable as long as counsel is afforded an opportunity to either cross-examine, impeach, or rebut the testimony, or if the court concludes that the violation was harmless. Neither outcome changes the fact that trial counsel was unfairly surprised and forced to address testimony that it had not prepared for because it was not disclosed prior to trial. Typically, a day-of cross-examination does not compare to having the information while preparing for trial. And this has been long recognized. In 1989, this court specifically recognized that "the failure of a party to supplement discovery when its expert witness formulates or changes an opinion may be grounds for reversible error." *Long v. Isakov*, 58 Ohio App.3d 46, 51 (8th Dist. 1989), citing *Shumaker*, 28 Ohio St. 3d 367 (1986); *Jackson v. Booth Mem. Hosp.*, 547 N.E.2d 1203 (8th Dist. 1988).

{¶ 75} The Rules of Civil Procedure delineate a clear process for disclosure of expert testimony specifically because of the preparation needed to address expert testimony at trial. Similarly, Civ.R. 37(C)(1) provides that failing to disclose information as required by Civ.R. 26(A) or (E) can be sanctioned by disallowing that party from using the undisclosed information at trial. This again indicates that the goal of the Rules of Civil Procedure is fairness and balance. The recent trend of softening the mandates of Civ.R. 26, especially as it relates to expert testimony, improperly suggests that strict compliance with the civil rules is not necessary and may even inure to the benefit of the party who does not fully comply with disclosure requirements or discovery rules.

{¶ 76} The Rules of Civil Procedure exist to provide predictability, efficiency, and fairness. I remind courts and litigants that the legal system is not the venue for gamesmanship and trickery but rather for the fair and just resolution of disputes. No party is excused from adhering to the civil rules, no matter the size or influence of the party.